Nelson David Christian, a Minor, by Rosetta Elmore, His Mother and Next Friend, Plaintiff-Appellee, v. New York Central Railroad Company, a Corporation, Defendant-Appellant.

Gen. No. 60–M–12.

Fourth District.

November 2, 1960.

Rehearing denied November 30, 1960.

Pope and Driemeyer, of East St. Louis, for appellant.

Morris B. Chapman, of Granite City, for appellee.

HOFFMAN, JUSTICE.

This is an appeal from a judgment for personal injuries arising out of an explosion of railroad torpedoes. The defendant, New York Central Railroad Company, sold to Luria Brothers & Company, Inc., a metal scrap dealer, a number of its obsolete steam locomotives. Luria, in turn, resold the locomotives to Granite City Steel Company, and delivery was to be made to the Steel Company at its Granite City plant. Because New York Central had no rail connection with the Steel Company's plant at Granite City, it was arranged that the Terminal Railroad Association of St. Louis would make the delivery by picking up the locomotives at designated interchange tracks. The interchange consisted of 12 or 13 parallel tracks owned by various railroads in an industrial area of the city. The area was posted with several signs stating that it was private property, dangerous and that the public should "Keep Out." Though the precise interchange tracks upon

which the engines were to be spotted were owned by New York Central, it was agreed that the care, custody and control of the locomotives passed to Terminal upon their being spotted by New York Central upon the designated interchange tracks. A practice developed of delivering several locomotives to the interchange track on week-ends upon call of the Steel Company.

The plaintiff in this case is a 13 year old boy. In early May, 1956, two of his 13 year old friends, Peter Kraus and Frank Fleming by name, went into the cabs of some steam locomotives standing near the tracks of Terminal and the Wabash Railroad in the interchange and owned by either Terminal or Wabash, and found some railroad torpedoes in the cabs of these locomotives. Some of these torpedoes were exploded by the boys on the spot, others were taken home with them. About one week later these torpedoes were shown to the plaintiff, and he indicated he would like to have some. Two weeks after that, on June 2, 1956, New York Central moved four of its locomotives to the interchange, and on that day Kraus took a paper sack, rode down to the interchange and entered these engines. He made a search of the engine cabs and found some 40 torpedoes. Kraus took these home and hid them. One week later he gave the torpedoes to plaintiff. Plaintiff was then staying with his grandmother, and when he reached her home, he exploded one of the torpedoes on the sidewalk. This brought the grandmother out of the house, and she took the remaining torpedoes from plaintiff and put them in a shed in her back yard. Two days later plaintiff and another friend found the torpedoes and decided to make a rocket with them. In the process, 12 or 15 exploded while being worked on by plaintiff. As a result plaintiff lost both legs 2 inches below the hip and suffered other injuries. Although his healing has been satisfactory, he has not been able to use artificial legs successfully.

Plaintiff originally sued the Steel Company, Luria and Terminal along with the New York Central. At the close of the evidence the first three named defendants settled out for the sum of $47,500.00. The jury's verdict was against New York Central in the sum of $300,000.00. Although judgment was entered on this verdict, a later order purported to reduce it to $252,-500.00. It is from these judgments that defendant New York Central appeals.

Numerous errors are assigned. It is defendant's position that the trial court should have directed a verdict for defendant because the alleged negligence was not the proximate cause of plaintiff's injuries; because of an intervening act which defendant was not legally required to foresee; and because of plaintiff's contributory negligence. In the alternative, it is defendant's position that a new trial should be ordered for one or more of the following reasons: the refusal of the trial court to grant a change of venue; improper voir dire examination of jurors by court and counsel; improper filling of the jury panel; improper instructions; failure to allow introduction of other settlements received by plaintiff; and, excessiveness of the verdict.

We have carefully examined each of the assignments of error and are satisfied that the verdict must stand or fall upon the allegation of error regarding the voir dire examination of the jurors.

The selection of the jury in this case was governed by the prescriptions contained in Supreme Court Rule 24–1, (Ill. Rev. Stat., 1959, chap. 110, par. 101.24–1).

"The judge shall initiate the voir dire examination of jurors in civil and criminal causes by identifying the parties and their respective counsel and he shall briefly outline the nature of the case. The judge shall then put to the jurors any questions which he thinks necessary, touching their

60

qualifications to serve as jurors in the cause on trial. The parties or their attorneys shall be allowed a reasonable opportunity to supplement such examination, but shall not directly or indirectly examine jurors concerning matters of law or instructions."

This rule originated in recommendations made by a select committee of judges to the 1958 annual judicial conference composed of the trial, appellate and Supreme Court judges of this state. In their report to the conference, the judges stated the need for such a rule as follows:

"Judges, throughout the State, faced with an ever expanding volume of litigation and in some sections scandalous delays, are increasingly concerned with the disposition on the part of trial counsel to prolong inordinately the voir dire examination by: 1. indulging in tedious and repetitious examinations; 2. propounding long rhetorical questions designed to ingratiate the lawyer with the jury rather than to elicit information and; 3. tiresome statements outlining the law, the inquisitor's philosophy and ideas on various subjects, his notion concerning the thought processes to be followed by the jurors all thinly disguised as questions by the expedient of punctuating the discussion from time to time with 'isn't that right?', or similar phrases more often than not without pause to allow the sometimes bewildered juror to answer. . . .

"The examination of jurors concerning questions of law supposed to be encountered in the case is without question one of the most pernicious practices indulged in by many attorneys. The usual procedure is to inquire as to whether or not jurors will follow certain instructions if given.

61

That the supposed instructions as orally expounded by the advocate are slanted, argumentative and often so clearly erroneous as to cause certain reversal if given by the court, suprisingly appears to be a matter of little concern. . . ."

"When an attorney is allowed to give his version of the law to the jury, the other lawyer is certain to retaliate by giving his version of it. . . . In any event propounding questions of law to the jury is of no aid in arriving at the legitimate purpose of the voir dire, namely, an intelligent exercise of the right of challenge. Such questions are improper and should not be allowed."

The drafting committee appointed by the Supreme Court, which was composed of nearly the same membership as the original committee, in proposing New Rule 24-1, stated:

"You will notice that the proposed rule is mandatory. . . . The prohibition as to matters of law is a most important element of the proposed rule. It is here that so many lawyers infringe upon the prerogatives of the court and under the guise of eliciting information attempt to impart to the jurors a conception of the law highly favorable to their side of the case. Such tactics, unfortunately almost universally followed in today's Illinois jury trials, invade the province of the court, are time consuming, tend to confuse the jurors and do nothing to further the purpose of the voir dire procedure. . . . Your Committee believes that the adoption of the proposed rule or the adoption of a similar rule will effect an appreciable saving of time, restore to the judge his duty to determine questions of law and limit the Illinois voir dire procedure to its original purpose; that of eliciting information rather than that of indoctrination."

In the only case decided by the Supreme Court since the promulgation of the rule, People v. Lobb, 17 Ill.2d 287, 161 N.E.2d 325, the Court said on page 299 of 17 Ill.2d, on page 332 of 161 N.E.2d: "In adopting Rule 24–1, this court sought to expedite jury trials in a manner consistent with the thorough protection of the rights and interest of the litigants. The evils attendant upon a lengthy and unrestricted voir dire examination of jurors have long been recognized."

In the Lobb case, the Court enunciated rules for the voir dire examination in view of Rule 24–1. The Court first set forth these general principles: It recognized that some form of voir dire examination is necessary to enable the parties to secure a fair and impartial jury, but stated that its scope and extent rested within the discretion of the court. This discretion is exercised properly if it does not prevent "pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently."

The Court then stated that Rule 24–1 allowed the parties "a reasonable opportunity to supplement the examination conducted by the court"; and the "only positive restriction in Rule 24–1 is that the jurors shall not be examined concerning matters of law or instructions." And the Court concluded that "no reason is perceived for questioning them as to legal principles or concepts beyond ascertaining whether or not they are willing to accept and follow the instructions concerning the law of the case." See pages 300, 301, 302 of 17 Ill.2d, pages 332, 333 of 161 N.E.2d.

■ ■ It has long been held that the discretion of the trial court over the voir dire examination is a judicial discretion, subject to review, and, if it is abused, it may bring about a reversal. Mithen v.

Jeffery, 259 Ill. 372, 102 N. E. 778, City of Quincy v. V. E. Best Plumbing & Heating Supply Co., 17 Ill.2d 570, 162 N.E.2d 373. Moreover, the Supreme Court has warned that counsel who seek to venture beyond the rules for the conduct of the voir dire examination do so at the risk of reversal of any judgment so obtained. St. Clair Housing Authority v. Quirin, 379 Ill. 52, 39 N.E.2d 363.

Having in mind the evils which were sought to be corrected by the promulgation of Rule 24–1, we now turn to an inspection of the voir dire examination in the instant case.

The complete voir dire examination of the jurors was transcribed by the court reporter. It consumed one entire week of trial, and extends over 809 pages of the record and 54 pages of the abstract. In all, 61 prospective jurors were called for examination. Extensive examination of each juror was made by the court and permitted of counsel.

Counsel for plaintiff was permitted to interrogate jurors upon specific points of law. He was allowed to suggest that the standard of due care was not the same for children as for adults, that a child's judgment was to be judged differently, and what the duty of due care was with regard to handling explosives. Many jurors were asked if they would follow the court's instruction on a specific point, whether or not they thought a certain rule of law was reasonable, or whether they found fault with it. For example, plaintiff was permitted to state to a juror, "I'm certain you appreciate that there is a difference in what should be expected of a child in reference to judgment and things of that kind than there would be of an adult, is that not true?" And, upon receiving an affirmative answer, plaintiff continued, "You would have no hesitancy about applying any such rule of law that might be given you in that regard, is that

right?" When the juror said that he would have no hesitancy, plaintiff continued, "And if his honor should instruct you in reference to the duty of one who has explosive material in reference to how he has to handle it and not permit it to come in contact with children and things of that kind, would you follow that rule of law?" These and similar questions were asked of many other jurors.

Apart from this examination by counsel, the court inquired of many jurors regarding their understanding of the amount of damages involved. In the opening statement of the court, the jurors were advised that plaintiff was suing the several defendants for $750,000.00. Subsequently several of the jurors were advised by the court that there was nothing binding upon them by virtue of the amount claimed, and that they could find that amount or any amount that the evidence required less than that. To another juror the court said, "Assessing damages for loss of two legs is maybe a difficult proposition." And to still another juror, "The amount asked is $750,000.00. You realize that this is a maximum rather than an absolute or any minimum. You as a juror would be free, if you found for the boy, to decide anywhere from zero or one dollar up to $750,000.00."

A further juror, one who had had war experience with ammunition and torpedoes aboard a battleship and submarine, told the court that he had handled explosives and railroad torpedoes and knew they were dangerous. The juror then stated to the court that he knew the instructions he was taught in the handling of torpedoes and was afraid, "I wouldn't make a very good juror." This juror was not excused, but inquiry of him was continued by the court, the amount of damages claimed was mentioned by the court, and further questioning by the court brought out the statement from this juror that he might not be im-

partial because he knew the care of those torpedoes that must be taken, and "the care that them torpedoes must be handled." Though this juror had made repeated disqualifying statements, the court turned him over to plaintiff's counsel for additional examination. Questioning by plaintiff brought out this answer, "I will tell you the truth about it, I know the care of torpedoes and there must be neglect someplace, and I just honestly feel that I wouldn't make a juror." But further interrogation was still permitted and plaintiff's attorney was allowed to ask the following questions before the juror was excused: "You feel because you have knowledge of these things and the danger that there is in it, you know to be in them, that is what you are saying; the way they have to be cared for, if you got on the jury, you would be prone to be against these defendants because these things are involved."

Some of the questions noted above were objected to by defendant and some were not. A motion for mistrial was made regarding the last delineated series of questions. The objections, when they were made, were overruled, and the motion for mistrial was denied.

It is defendant's contention that the voir dire examination which the court conducted, and permitted plaintiff's counsel to conduct, was outside the permissive scope of Supreme Court Rule 24–1, and was so erroneous and prejudicial as to require a new trial.

Plaintiff, in his brief, does not attempt to justify the conduct of the voir dire examination. Instead, he points out that defendant also questioned prospective jurors concerning matters of law and instructions, and referred to the rules pertaining to burden of proof proximate cause and intervening agency. Plaintiff argues that any error he might have made was aided and compounded by error of the defendant and suggests that, for this reason, defendant has waived any

alleged errors in the conduct of the voir dire examination of the jurors.

This is a most serious case. It involves tremendous issues on both sides. A boy, scarcely in his teens, has been horribly mangled and left legless. The extent of his injuries is almost incalculable. On the other side is a defendant of immense wealth. There would be no question about the payment of a verdict. The question of liability to be decided hangs upon a slim thread of events continuing over a number of days, and is challenged by suggestions of trespass, contributory negligence and intervening cause, which to the lay mind can be concepts of the most delicate nicety. The decision to be made by the trier of fact is of great magnitude. In such a case as this, the trier of fact, the jury, must be selected with the most extreme care and through a rigorous application of the rules. No opportunity must be given to either side to indoctrinate a juror, even slightly. For, as has been noted by the Supreme Court, in such event it is impossible to tell what such effect is upon a juror's mind. McCarthy v. Spring Valley Coal Co., 232 Ill. 473, 83 N. E. 957.

From an examination of the record here, it is obvious to us that counsel for plaintiff was permitted to run rampant in the selection of this jury. The main effort of his examination was to indoctrinate, to persuade and to control. As the defendant watched plaintiff attempt to convert a panel to his beliefs, the defendant naturally launched upon a reconversion when its time came. Rules of law and potential instructions were thrown out by both sides in such slanted ways that utter confusion as to the applicable law must surely have reigned in the lay minds in the box.

That counsels' voir dire examination of the jurors in this case was wrongful, there can be no doubt. Nearly every evil which Rule 24–1 sought to eradicate

67

was present. There was no excuse for consuming five full court days to select this jury. Indoctrination of the individual jurors was the object; pre-education was the sole purpose. The examination by counsel upon specific points of law was clearly in violation of Rule 24–1. That rule, and the Supreme Court's interpretation of it (People v. Lobb, supra), clearly precludes anything beyond a broad question of whether or not a juror would accept and follow the instructions of the court upon the law of the case. By allowing counsel to go beyond this point, reversal is invited if the case is close upon the law and the evidence.

Moreover, the interrogation by the court, which emphasized the amount of damages sought, included an admonition that assessing damages for the loss of two legs was difficult, and which continued to emphasize the dangerousness of torpedoes by allowing the questioning of an obviously incompetent juror to continue, was a clear abuse of discretion and far exceeded the bounds of proper voir dire examination. How indelibly the court's words sank into the minds of the respective jurors can never be known, but the Supreme Court constantly admonishes that "jurors are ever watchful of the attitude of the trial court, so that his slightest word or intimation is usually received with deference and may prove controlling." See People v. Riggins, 8 Ill.2d 78, 85, 132 N.E.2d 519, 522.

█ In our judgment the jury which ultimately was chosen to decide the facts of this case and to assess the damages suffered by the plaintiff was not properly selected. It is our view that the examination of the jurors, as a whole, was conducted in such manner as to create a climate in the courtroom and conditions in the jurors' individual minds which made a fair trial to either side a positive uncertainty. We say this because we cannot tell which words of persuasion and solicitation sank in the deepest nor how delicately

68

the turn in mind may have been because of some of the court's inquiries. Because we cannot be sure that either side had the fair and impartial jury to which it was entitled, we cannot say that the parties had a fair trial, and we must, accordingly, reverse.

The several judgments appealed from are reversed and the cause remanded for a new trial.

CULBERTSON, P. J. and SCHEINEMAN, J., concur.