LEANN M. RUB, Ex'r of the Estate of Howard G. Rub, Jr., Deceased, *et al.*, Plaintiffs-Appellants, v. CONSOLIDATED RAIL CORPORATION, Defendant-Appellee.

First District (2nd Division)    No. 1—99—2121

Opinion filed May 28, 2002.

William F. Fitzpatrick, of Callahan, Fitzpatrick & Lakoma, of Oak Brook, and Roger B. Gomien, of Gomien, Harrop & Sobol, of Morris, for appellants.

Lord, Bissell & Brook, of Chicago (Hugh C. Griffin, David R. Schmidt, C. Kevin McCabe, and Stevie A. Kish, of counsel), for appellee.

JUSTICE McBRIDE delivered the opinion of the court:

On November 25, 1992, Howard G. Rub, Jr. (Rub), was killed when a train owned and operated by defendant-appellee Consolidated Rail Corporation (Conrail) collided with his vehicle. The accident occurred at the intersection of Morris Road and the Conrail tracks in Dwight, Illinois. Leann Rub (plaintiff), widow of Rub, filed a wrongful death action against Conrail in her individual capacity and on behalf of the estate of Howard G. Rub, Jr. Among other allegations, Leann Rub alleged in her second amended complaint that the Morris Road crossing

was improperly maintained by Conrail, that Conrail failed to provide adequate warning of approaching trains at the crossing, and that the operators of the train at issue were negligent by failing to slow the train to avoid a collision with Rub's vehicle. Conrail responded by contending that Rub was contributorily negligent in causing the collision that resulted in his death. A jury returned a verdict in favor of Conrail, and the trial court entered a judgment on the verdict against Leann Rub and the estate of Howard G. Rub, Jr., on November 27, 1997. Plaintiff filed a posttrial motion, which was denied by the trial court on May 28, 1999. Plaintiff now appeals.

Several questions are raised on appeal. First, whether the trial court erred during *voir dire* when it allowed counsel for defendant to question prospective jurors on facts not yet in evidence. The second, third, fourth, and fifth issues are discussed in the nonpublished portion of this opinion. Second, whether the trial court erred by giving certain jury instructions. Third, whether the trial court erred by excluding evidence as to the extrahazardous nature of the Morris Road crossing. Fourth, whether the trial court gave the jury improper limiting instructions that were prejudicial to plaintiff. Fifth, whether the cumulative effect of the errors denied plaintiff the right to a fair trial. We state the following background facts.

On the evening of the accident, Rub was driving southbound on Morris Road at approximately 55 miles per hour. The Conrail train tracks run east to west and cross Morris Road at a perpendicular angle. The evening was overcast and the blacktop pavement was wet. Approximately 390 feet north of the intersection, a circular advance warning sign with a yellow background was posted displaying a black X and a black RR, indicating to approaching motorists that a railroad crossing was ahead. At the crossing itself, a cross buck sign was posted. A cross buck sign is a cross on a wooden post that indicates the presence of a railroad crossing. There were no flashing lights at the intersection, no gates, and no lights designed to illuminate the grade crossing. The grade was elevated at the intersection.

As Rub approached the intersection, a westbound Conrail train consisting of 2 engines and 44 freight cars was advancing on the same crossing at 40 miles per hour. James Grimes, the train's engineer, testified the train's lights were on. He also stated that he saw Rub's vehicle approaching the intersection at the same distance and the same rate of speed. He said that he became concerned because it did not appear that Rub was going to stop. Grimes stated that Rub did not seem to respond to a whistle sequence he had blown in order to warn him of the approaching train. He further testified that he began a series of short blasts on the whistle up to the impact with Rub's vehi-

cle. Also prior to impact, Grimes said that he threw the emergency brake on the train before Rub reached the cross bucks at the intersection. The record revealed that Grimes and the train's conductor, Charles Rice, were reluctant to put the train into emergency because they feared derailment of the train, their safety, and the safety of the public in the surrounding area. Rice testified that it was unsafe to activate the emergency brake and risk putting the train into emergency when Rub had plenty of time to stop.

The record reveals that Rub continued to proceed to the intersection. His vehicle was hit broadside by the locomotive and the collision resulted in his death. The evidence showed no indication of braking marks or skid marks anywhere in the intersection.

In plaintiff's case in chief, Daryl Holt, then president of the Village of Dwight, testified that he became involved in negotiating the cleanup of overgrown brush at the intersection which made the crossing difficult to see. He also stated that headlights of trains were difficult to see because they blended into the background lighting in the area. Holt said that Conrail had not remedied these problems prior to Rub's accident.

Two Dwight residents who lived in close proximity to the intersection testified that they never heard the train's whistle blow.

In addition, Tony Montgomery, a former employee of Rub, testified that he was driving in another car closely behind Rub's auto at the time of the accident. He said that he neither saw nor heard the train approaching until it struck Rub's vehicle.

John Edward Baerwald, one of plaintiff's expert witnesses, testified that the surrounding sources of light from homes and other public lights camouflaged the headlights of the on-coming train. He also characterized the crossing as extrahazardous as defined by railroad engineers. Baerwald further stated that, at minimum, the crossing should have had two alternately flashing red lights "or[,] more desirably[,] flashing lights plus *** short arm gates *** that drop down and close off the approach lanes."

Henry Lowell Lazara, a specialist in forensic lighting, also testified for plaintiff. He stated that he inspected the intersection at Morris Road and determined it to be an "unlighted area."

Michael Massie, plaintiff's railroading expert, testified that Grimes and Rice were negligent in their failure to apply the train's brakes. He specifically stated that Grimes could have slowed the train down to 35 miles per hour in the distance to the crossing, which would have allowed Rub's vehicle to clear the track.

To the contrary, Conrail's expert witness, Thomas Burnes, an engineer, stated that he had inspected the intersection on four sepa-

rate occasions. He said that the headlamps of locomotives he observed were clear and distinctly different from any of the background lights. He further testified that, in his opinion, there were no material obstructions to visibility that would have prevented a motorist from seeing and identifying an approaching train. Thus, he concluded that a motorist would have had an opportunity to observe the train and to take evasive action if necessary. Burnes said that there are certain factors that make an intersection extrahazardous, specifically, where the hazard is so intense or unusual that it exceeds the capability of a motorist, driving in due care, to appreciate the risk involved and to exercise the appropriate level of caution. He further stated that he did not characterize this intersection as extrahazardous because crossing it was not beyond the capabilities of motorists that were operating their vehicles in due care.

William Egan, a Conrail employee in charge of the engineer training school at the company, said that Grimes and Rice maintained a proper lookout prior to the accident, properly implemented the warning devices on the locomotive, and appropriately put the train into emergency. He further stated that "you never put a train into emergency unless you know you're going to hit something."

After all the evidence had been presented, the jury returned a verdict in favor of Conrail. Plaintiff does not allege that the jury's verdict was against the manifest weight of the evidence, but she claims that numerous errors made by the judge below warrant a new trial.

■ The first issue raised on appeal is whether the trial court conducted a proper *voir dire*. We have stated:

> "The purpose of *voir dire* is to assure the selection of an impartial jury, free from bias or prejudice. [Citation.] The trial judge has the primary responsibility for initiating and conducting *voir dire*, and the scope and extent of *voir dire* are within his sound discretion. [Citation.] Upon review, an abuse of discretion will be found only if the trial judge's conduct prevented the selection of an impartial jury." *Dixson v. University of Chicago Hospitals & Clinics*, 190 Ill. App. 3d 369, 376, 546 N.E.2d 774 (1989).

Also, it may be error for the court to fail to curtail *voir dire* that becomes an attempt to indoctrinate or preeducate jurors or to obtain a pledge as to how they would decide under a given set of facts or determine which party they would favor in litigation. *Gasiorowski v. Homer*, 47 Ill. App. 3d 989, 992, 365 N.E.2d 43 (1977).

Plaintiff argues that the trial judge improperly permitted Conrail to discuss facts not yet in evidence with prospective jurors. Specifically, plaintiff complains of defense counsel's reference to the cross bucks at the Morris Road intersection and subsequent attempts to

solicit the venire persons' views on the protection cross bucks afford to motorists. Plaintiff also contends that the *voir dire* conducted by Conrail provided jurors with an incomplete and misleading characterization of the law as it relates to cross bucks. As a result of these errors, plaintiff argues the trial judge should have taken corrective action in the form of calling for a new venire or providing a cautionary instruction. According to plaintiff, the trial court's failure to do so resulted in the denial of a fair trial.

We first address plaintiff's complaint that defense counsel improperly introduced a fact, specifically the presence of cross bucks at the Morris Road crossing, that had not yet been introduced as evidence.

At the outset of *voir dire*, the court addressed the prospective jurors with the following overview of the case:

> "So I am in a position to tell you in general what the case is about, but I do not want you to think that I am telling you evidence because I don't tell you evidence. What the lawyers say in fact is not evidence. Evidence comes from up here under oath.
>
> * * *
>
> Basically, a review of the type of case is as follows: Howard Rub was operating a car on Morris Road in Dwight, Illinois. There was a collision between his car and a Conrail train at a railroad crossing. As a result, Howard Rub was killed. The plaintiff alleges this incident was a direct and a proximate result of negligence on the part of the railroad, and the defendant railroad denies that any conduct on its part constituted negligence."

A review of the record reveals that the subject of whether the crossing was marked was first raised by prospective juror Francis Prather, who said:

> "[MR. PRATHER]: I don't know whether I can ask a question.
>
> [THE COURT]: Well, you can ask me anything you want.
>
> Q. Was it a marked or an unmarked crossing?
>
> A. That I don't know yet, but we are going to find out that evidence as it develops under oath from up here, but I am wondering not how you will decide it but whether in a general sense this kind of case gives you a hard time?
>
> [MR. PRATHER]: I don't know any reason why."

Before defense counsel asked any questions of Prather, plaintiff's attorney elicited the following:

> "Q. *** [S]ince this is a train collision case, could you tell me just a little about the incident where your mother-in-law was killed or injured?
>
> A. This was in Montana, and she was hit at an unmarked crossing and had hip replacement and walked with a limp for a number of years until she passed away."

Plaintiff's attorney then continued:

"Q. When you say unmarked, are you talking about—

A. *** It was probably the crosses but not the—not lights.

* * *

Q. *** Do you feel that there is anything about that incident that would prevent you from being fair and impartial in this case?

A. I don't believe so, no."

In response to a question from plaintiff's counsel, the next prospective juror, Rosevetta Stan, said:

"A. *** [T]he big guy is always guilty, and he should pay, like the railroad if that is what it is.

Q. *** [Y]ou have a feeling that the railroad because they are big they should pay? ***

A. Yeah.

Q. You are not just saying that because you want to get out of here and get back to your cosmetology business?

A. No, this is the truth."

Stan also said that crossing the train tracks every day made her afraid. After examining several other prospective jurors, plaintiff's counsel tendered the panel to defense counsel. After examining several prospective jurors, defense counsel then asked Prather:

"Q. You discussed somewhat this morning the circumstances of the railroad accident that involved your mother-in-law some years ago in Montana?

A. Yes.

Q. And early on before any of the lawyers asked you any questions, when the judge was asking you questions, you in essence asked him a question about was this a protected or unprotected crossing. Do you remember that?

A. Right.

Q. *** When you told us about the incident involving your mother-in-law, you indicated that [it] had a cross bucks only protection sign at the crossing, correct?

A. Right.

Q. Now, is that something that you believe or feel is not a protected crossing or is not sufficient or is not adequate?

* * *

Q. Okay. My question would be then if—would you consider it to be an unsafe condition at a railroad crossing if the protection that existed there was simply a cross bucks instead of lights, flashers, things of that nature?

A. Not if there were—there was sufficient vision both ways.

* * *

Q. *** Is there anything with respect to the circumstances of

your prior experience or your general knowledge that would prevent you in this case from weighing the evidence, listening to both sides and then rendering a fair and impartial verdict based upon the facts and the evidence in the laws as instructed to you by the court?

A. I would have no problem with that, no, not really."

Plaintiff's counsel raised no objections to these questions posed by the defense attorney.

Counsel for plaintiff then asked Prather the following question:

"Q. Now in this particular case if you hear evidence that the crossing was protected by a cross bucks only, will you give us your assurance that you'll listen to all of the evidence and you'll make a fair determination based on the law that Judge Flan[a]gan gives you the crossing was adequate in this case?

A. Yes."

Later during *voir dire*, defense counsel asked Beth Larson, a prospective juror, the following question:

"Q. We talked a little bit earlier concerning cross bucks protection railroad with Mr. Prather, and I asked him questions about whether he had a problem with that based upon the history of the accident with his mother-in-law. Do you have any feelings one way or the other that just a cross buck at a railroad crossing is not good enough and there has to be something else no matter what?

A. I don't think so. I mean I certainly like the ones that have the lights better for my sake, but, you know, I don't think—I guess the answer is no.

Q. What I need to know is whether you have any preconceived notion or preconceived bias that there has to be more protection at the crossing than just a cross buck, and that in and of itself means that there's a problem and something else should be there and if it isn't, then there's guilt whether it's negligence or fault.

A. I don't think it's a question of negligence, no."

Plaintiff's counsel made no objections to these two questions posed by defense counsel. The panel of prospective jurors was then accepted by both sides, excused for the day, and instructed to return to the jury room the next day.

During the selection of the next four jurors, plaintiff's attorney asked Mr. Shannon:

"Q. You heard some questions about the cross bucks or cross buck crossings, correct?

A. Yes.

Q. You understand that in this case you may have to decide whether or not in this particular crossing cross bucks were adequate to protect a crossing or whether the crossing needed ad-

ditional protection. Will you listen to all of the evidence fairly on that before deciding?

A. Sure."

Plaintiff's counsel excused Mr. Stevich, a potential juror, and then examined the next prospective juror, Kathleen Kushnapor. During earlier questions posed by the court, Kushnapor revealed that her brother had been in a car accident and had suffered a crushed pelvis. As result of the accident, she stated that her brother always walked with a limp. Plaintiff's attorney asked Kushnapor the following questions:

"Q. There were some questions asked about railroad crossings and crossings that don't have flashers, they just have cross bucks. Do you remember those questions?

A. Yes.

* * *

Q. There's going to be an issue in this case about whether or not the railroad crossing involved in this case had adequate protection. Will you listen to all of the evidence on that issue and then make up your mind after hearing all the evidence?

A. Yes.

* * *

Q. You'll give both sides a fair trial?

A. Yes."

Plaintiff's counsel indicated that he would accept the panel of Ms. Kushnapor, Ms. Lingo, Mr. Shannon, and Mrs. Spirodovich.

Defense counsel then asked Ms. Lingo a series of questions about a car accident in which she was injured. During plaintiff's questioning, Lingo revealed that, as a result of the accident, she had refused to drive since the age of 14. Defense counsel asked whether she had any "preconceived ideas" because of the accident and whether there were problems with any of the signals at the intersection where the accident took place. Specifically, defense counsel asked:

"Q. Now, based upon your experience as a non-driver but being a passenger and observing traffic and situations that develop, do you have, again, feeling that would shape you one way or another in terms of protection of railroad crossings? In other words, do you believe that just having a cross buck sign at a crossing where a railroad goes isn't enough and there should be something there no matter what?

A. I think there should be gates and lights no matter what.

Q. Based on that, would you be able to be fair in this situation where there was not a situation where there were lights and gates?

A. I would hope I could be, but I couldn't guarantee. My belief there should be gates and lights, but not having ever done this, I don't know.

Q. So it seems to me what you are saying is you have a preconceived notion or preconceived notice that—

A. I have a reservation about not having gates.

Q. And that they well might make it difficult for you to be fair and impartial here?

A. Possibly, yes."

Outside the presence of the jury, defense counsel moved to dismiss Lingo for cause. Despite her statements above concerning an inability to be fair, plaintiff's counsel objected that she be excused for cause. Based upon Lingo's statements that she might not be fair, the trial court dismissed her for cause. We also note that up to this point, plaintiff's counsel had made no objection to the questions posed by defense counsel concerning cross bucks.

Once the panel had been tendered to the defense, defense counsel then asked venire person Smith and venire person Shannon if they had any preconceived notion or preconceived bias about the concept of adequate protection at a railroad crossing. The same question was posed to venire person Kushnapor, who responded that the presence of only cross bucks at an intersection might possibly make it difficult for her to be fair and impartial.

After a similar question had been asked to venire person Spirodovich, a side bar was requested by defense counsel. At the side bar, defense counsel moved to dismiss Kushnapor for cause. When the court asked for a response to the motion to excuse, plaintiff's counsel stated for the first time:

"I want to make an objection to the line of inquiry [defense] counsel continues to follow. I think its incorrect for him to emphasize a bit of evidence to the exclusion of everything else and try and extract from the jurors a commitment or some type of frame of mind as to what they are going to do."

In response, the court stated:

"It's hard to control because it all started with a juror postulating the question about whether it was a cross bucks only type of a question. I responded to the juror along the lines of that he would get the evidence eventually, and counsel having gotten that lead in from the juror mentioned to him now when the judge was speaking to you, you mentioned something about was it cross bucks only. Would you mind telling us how that affects your thinking which I think was perfectly permissible. He brought it up, and I think counsel had a right to follow it up."

Plaintiff's counsel then contended that defense counsel had been "brow beating" the jurors. The court immediately disagreed with this claim and defense counsel pointed out that he was not seeking a commitment from any of the jurors. The trial judge then denied defen-

dant's motion to excuse Kushnapor for cause. Plaintiff's counsel asked that no further questions on the subject of cross bucks be asked of Kushnapor. The trial judge indicated that he did not believe the questioning had been improper up to that point and overruled plaintiff's request. Defense counsel chose not to inquire further and then asked the trial court that Kushnapor be peremptorily excused. Immediately after this discussion, the trial court dismissed Kushnapor.

After one prospective juror said that he did not think he could be fair to the railroad, another potential juror, Frances Rogers, was examined by the court. She also indicated some concern about serving as a juror. Specifically, she said that she never drove a car and that there should be lights at every railroad crossing. Counsel for the defense then asked Rogers the following question:

"Q. And if you think there should be [a light] at every crossing, if you find out in this particular instance that there isn't one, is that going to have an impact on you in the way that you are going to view the evidence and the facts of the case?

A. No, not really."

The defense then requested that Ms. Rogers be peremptorily excused, and the trial court granted the request.

After Janet Kohn, a prospective juror, told the court that she felt that there should be gates at railroad crossings, defense counsel asked her the following question:

"Q. *** [I]f the fact is that this crossing that was involved in this incident is a cross buck only protected crossing, would you be able to consider all of the other factors in conjunction with that towards making your decision, or would it simply be because of your feeling about protection, cross bucks is it and that's the determinative factor.

A. I think it is pretty necessary. I do think the gates are necessary to prevent anything to happen. I do feel that way."

Plaintiff's counsel did not object to this particular question asked by defense counsel. Ultimately, defense counsel used a peremptory challenge to excuse Ms. Kohn.

Next, defense counsel asked prospective juror Leona Harris the following questions:

"Q. *** You have indicated that you can be fair and impartial to both sides, I want to ask you specifically if there is any issue involving railroad protection and situations of crossing that presents a problem to you with respect to cross bucks as opposed to flashers as opposed to gates; does that create a problem for you?

A. No.

Q. And the fact that in the particular circumstances here where

there was cross bucks only as opposed to flashers or gates, that doesn't predispose you one way or the other?

A. Not at all.

Q. You look at the big picture, hear the facts and here [sic] the evidence, see where it comes down?

A. Exactly."

Plaintiff's counsel made no objection to these questions.

Moments later, plaintiff's counsel asked Harris:

"Q. My question to you is if, in fact, the evidence shows in this case that the crossing where Mr. Rub was killed was not adequately protected, that cross bucks weren't enough, would you have any hesitancy in returning a verdict for the plaintiff if that's the case after hearing all the evidence.

A. No."

After Leona Harris was examined further, she was accepted as a juror, and the second panel was sworn in.

During the selection process for the third panel, Anita Long, a prospective juror, asked defense counsel: "I never heard the term cross bucks. I don't know what you are talking about." Defense counsel responded:

"Q. Cross bucks are a sign that's up at a railroad crossing that indicates—it is a cross on a wooden post that indicates the presence of a railroad crossing. No flashing lights and no gates.

*** [T]here is [sic] a lot of them.

A. *** I'm not that familiar with country roads.

Q. *** [W]ould that impact on your ability to be fair and impartial in this case?

A. No."

At the time, plaintiff's counsel did not object to the above question. Later in the proceedings, however, the following conversation occurred between plaintiff's counsel and the trial court:

"MR. GOMIEN [Plaintiff's counsel]: But if you will recall, counsel in his voir dire kept talking about cross bucks, and in response to one lady's question said there are many of them.

THE COURT: Yes. That was an unfortunate comment."

Defense counsel then asked Darell Wiley, a prospective juror:

"Q. So as you are sitting here today and we are having this conversation, what you are telling me is that just because a crossing has cross bucks and not gates and flashers, you will just take that into consideration along with the other factors?

A. Yes. Among other factors, yes."

Plaintiff's counsel did not object to this question.

Later in the proceedings the defense attorney asked Patrick Kennedy, a prospective juror, the following questions:

"Q. You obviously heard we are talking about a cross buck protected crossing as opposed to other types of protection. Is that a problem to you?

\* \* \*

Q. \*\*\* [W]ould [the presence of only cross bucks] impact your ability to be fair and impartial and look at all the factors involved in this case and make a decision as to—

A. As far as being fair and impartial, no."

Plaintiff's counsel did not object to these questions.

Later in the proceedings, Anita Stone, a prospective juror, told the court that there should not be any railroad crossings without flashers. Defense counsel then asked:

"Q. What is your specific feeling with respect to protection at railroad crossings in general? What do you think should be there?

A. I think you should have not only flashers, there should be guardrails devised in a way that people can't get around them and maybe even speakers talking to them.

\* \* \*

Q. And would it be fair to say that brings you here with a pre-conceived notion or pre-conceived bias if a crossing doesn't have that type of protection, well, then there is a problem?

A. They should be there.

Q. So would the answer to that question be a yes, you have pre-conceived bias on that issue?

A. Well, yes."

Plaintiff's counsel did not object to these questions. Based on the answers given by Stone, the defense sought to dismiss her for cause. The trial judge dismissed her for cause.

Cheryl Utecht-Themer, another prospective juror, told the trial court, "my preference would be that at the crossing areas \*\*\* there is protection beyond cross bucks." She was then asked the following question by defense counsel:

"Q. At the invitation of the judge, you volunteered your thoughts concerning crossing protection. Could you tell me a little bit more about that, \*\*\* what your thoughts or feelings are about the types of protection or what is or is not appropriate or what you think should or should not be there?

A. Well, obviously, if more protection at a crossing could save a life, that's you know, whatever it costs for those protectors or whatever is certainly worth it.

\* \* \*

Q. \*\*\* You understand that there is [sic] two sides to every story and it is important to weigh both sides before you start weighing the evidence?

A. Yes."

Plaintiff's counsel did not object to these questions posed by defense counsel.

■ On appeal, plaintiff argues that all of the questions asked by defense counsel above were improper because the prospective jurors' opinions concerning the presence of protection at railroad crossings were solicited before the evidence had been presented. We disagree for several reasons.

First, plaintiff's counsel, with the exception of one instance, failed to object at the time the complained-of questions were raised by defense counsel. We note that plaintiff did make a general objection to the defense's line of questioning during the side bar where the defense sought to dismiss Kathleen Kushnapor for cause. " 'Preservation of a question for review requires an appropriate objection in the court below [citation], and failure to object constitutes waiver.' [Citation.]" *Kotvan v. Kirk,* 321 Ill. App. 3d 733, 750, 747 N.E.2d 1045 (2001). A review of the entire record reveals that plaintiff failed to specifically object to most of the questions posed by defense counsel. Thus, plaintiff has waived the issue.

Second, waiver aside, a review of the record reveals that the questions asked by defense counsel were proper. The supreme court has stated:

> "The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice. [Citations.] Under our Supreme Court Rule 234 [citation] the primary responsibility for initiating and conducting the *voir dire* examination lies with the trial judge [citation], and the scope and extent of the exam rests within his discretion [citation]." *Kingston v. Turner,* 115 Ill. 2d 445, 464-65, 505 N.E.2d 320 (1987).

177 Ill. 2d R. 234. When questioning of prospective jurors is turned over to counsel, it has been held that it is properly within the scope of questioning to expose any hidden bias or prejudice of a prospective juror. *Friedman v. Park District of Highland Park,* 151 Ill. App. 3d 374, 382, 502 N.E.2d 826 (1986).

We find that the questions posed by defense counsel were appropriately designed to expose any latent prejudice by jurors against railroad crossings where no lights, gates, or flashers were present. In *Scully v. Otis Elevator Co.,* 2 Ill. App. 3d 185, 198, 275 N.E.2d 905 (1971), the plaintiff's counsel used a figure of $600,000 in framing questions to prospective jurors during *voir dire.* On appeal, the defendant claimed that these questions were prejudicial because the use of this figure indoctrinated the jurors into thinking that an award for a lesser sum would be unfair. The appellate court found that the questions propounded by the plaintiff's counsel were appropriate

because they were designed to expose any latent prejudice among the prospective jurors against large verdicts. *Scully*, 2 Ill. App. 3d at 198.

In our view, the questions asked by defense counsel in the instant case were similarly designed to expose a latent prejudice among prospective jurors against railroad crossings where lights, gates, and flashers were not present. The record clearly demonstrates that many prospective jurors had a preconceived bias against crossings where only cross bucks were present.

Further, the record reveals that the questions complained of were designed to explore this communicated preconceived bias among certain prospective jurors against the railroad. Defense counsel was entitled to inquire about any hidden bias or prejudice demonstrated by these prospective jurors. We also conclude that the questions posed by defense counsel did not indoctrinate the jurors. Instead, the questions were appropriately designed to expose a latent prejudice against railroad crossings only marked by cross bucks. An examination of the *voir dire* in its entirety demonstrates that the prospective jurors who demonstrated a preconceived bias against crossings that lacked lights, gates, flashers, or guardrails, and who further indicated an inability to be fair and impartial as a result of this bias, were dismissed. On the other hand, jurors who communicated an ability to be fair, impartial to both sides, and to weigh all the evidence were not dismissed. We therefore conclude that the questions posed by defense counsel served the proper purpose of *voir dire* and neither indoctrinated the prospective jurors nor prejudiced plaintiff.

Third, we note that, on several occasions during *voir dire* questioning, plaintiff's counsel discussed the adequacy of cross bucks as the only measure for ensuring safety at the Morris Road crossing. As noted above, specifically in regard to questioning Leona Harris, plaintiff's counsel said:

> "Q. My question to you is if, in fact, the evidence shows in this case that the crossing where Mr. Rub was killed was not adequately protected, that cross bucks weren't enough, would you have any hesitancy in returning a verdict for the plaintiff if that's the case after hearing all the evidence[?]"

This is similar to the kind of question concerning cross bucks that plaintiff suggests was improperly posed by defense counsel. A plaintiff is precluded from challenging error that he injected into the proceedings. *Ervin v. Sears, Roebuck & Co.*, 65 Ill. 2d 140, 144-45, 357 N.E.2d 500 (1976). Because plaintiff participated in the line of questioning and did not object to many if not most of the questions now complained of, plaintiff is prohibited from challenging the alleged error on appeal.

■ Plaintiff also claims that most of the prospective jurors sat throughout the entire *voir dire* and were likely tainted by defense counsel, who "talked endlessly about cross bucks and suggested that anyone who did not regard cross bucks as adequate protection was unfit to sit on the jury." As a result, the plaintiff suggests that the entire venire should have been excused. Based on a review of the entire *voir dire*, we disagree with plaintiff's position.

The record reveals that after the first panel of jurors was selected, the jurors were excused and told to return the next morning. After the second panel was selected, those jurors were also excused from the courtroom and did not witness the remaining *voir dire*. Thus, plaintiff's argument that the jury was somehow tainted by exposure to defendant's questions is not persuasive.

Further, as we noted above, the tenor of the questions raised by defense counsel focused on exposing a latent bias from jurors who communicated a preconceived disposition against the railroad. With regard to a majority of prospective jurors, defense counsel ended his examination with questions concerning whether that prospective juror could be fair and impartial. Thus, even if many prospective jurors sat through the entire *voir dire*, they would have observed that the jurors who were excused were those who demonstrated that they could not be fair and impartial to both sides. Therefore, we are not persuaded by plaintiff's argument that the jury was tainted and should have been excused.

Additionally, the authority relied upon by plaintiff is distinguishable. In *Christian v. New York Central R.R. Co.*, 28 Ill. App. 2d 57, 59, 170 N.E.2d 183 (1960), a 13-year-old boy was severely injured when several railroad torpedoes with which he was playing exploded. The torpedoes were obtained by the boy's friends from defendant's obsolete steam locomotives.

During *voir dire*, counsel for plaintiff was permitted to interrogate several jurors upon specific points of law. With respect to one juror, the venireman told the court that he had handled railroad torpedoes, that he knew they were dangerous, and that he would not make a very good juror. The juror was not excused and was further questioned by the court. The questioning revealed a statement from the juror that he might not be impartial because he knew the degree of care necessary for handling railroad torpedoes. Despite more than one disqualifying statement, the court turned the juror over to questioning by the plaintiff's counsel, which yielded this answer from the juror: " 'I will tell you the truth about it, I know the care of torpedoes and there must be neglect someplace, and I just honestly feel that I wouldn't make a good juror.' " *Christian*, 28 Ill. App. 2d at 66. The trial court permitted plaintiff's counsel to ask the following questions before this

prospective juror was excused: " 'You feel because you have knowledge of these things and the danger that there is in it, you know to be in them, that is what you are saying; the way they have to be cared for, if you got on the jury, you would be prone to be against these defendants because these things are involved[?]' " *Christian*, 28 Ill. App. 2d at 66.

The appellate court found that "counsel for plaintiff was permitted to run rampant in the selection of this jury." *Christian*, 28 Ill. App. 2d at 67. Further, the court stated, "[t]he main effort of [plaintiff's] examination was to indoctrinate, to persuade and to control [the selection of prospective jurors]." *Christian*, 28 Ill. App. 2d at 67. As the defense observed the plaintiff's attempt to convert the jury panel to his beliefs, defense counsel "naturally launched upon a reconversion when [his] time came." *Christian*, 28 Ill. App. 2d at 67. Because of the clear abuse of *voir dire* examination by counsel for both parties, the court found that reversal was warranted. *Christian*, 28 Ill. App. 2d at 68-69.

*Christian* is distinguishable because the main effort of the plaintiff in that case was to indoctrinate the jury. In the instant case, the record does not demonstrate an abuse of *voir dire* by defense counsel. Instead, the evidence indicates an effort by defense counsel to uncover bias among prospective jurors. We find no abuse of *voir dire* by defense counsel in the instant case.

In *Gasiorowski*, the plaintiff, a pedestrian, suffered personal injuries when she was struck by an automobile while crossing Belmont Avenue in Chicago mid-block. The jury returned a verdict in favor of the defendant-driver, finding that the plaintiff was guilty of contributory negligence. During *voir dire*, plaintiff's counsel sought to ask prospective jurors whether they had ever seen pedestrians crossing streets in mid-block and whether they, as pedestrians, had themselves ever crossed streets in mid-block. The trial court did not permit counsel to ask these two questions. The plaintiff, among other things, appealed that decision. The appellate court found that the trial court was well within its discretion to prohibit such questions because:

> "Questions which tend to put prospective jurors in the place of the parties to the litigation open a wide range of possibilities for indoctrination or pre-education of jurors, and lend themselves all too easily to attempts to obtain some positive indication as to which party the jurors might favor." *Gasiorowski*, 47 Ill. App. 3d at 994.

We find the facts in *Gasiorowski* are distinguishable from those in the instant case. In *Gasiorowski*, the court prohibited plaintiff's counsel from asking two questions on *voir dire*. Here, the court permitted defense counsel to ask certain questions to prospective jurors. We conclude that these questions did not taint the selection of an impartial

jury and that the trial court did not abuse its discretion in allowing the inquiry.

While the trial court itself acknowledged that it may have been mistaken in allowing questions by counsel for both sides on the topic of cross bucks, it determined that such questioning was not prejudicial and did not deny plaintiff a fair trial. We note that the trial court reviewed its own conclusion and evaluated significant portions of the *voir dire* in a 24-page order that denied plaintiff's posttrial motion. While the questioning of defense counsel on a few occasions arguably went beyond ascertaining whether a juror was free from bias or prejudice, we do not conclude that it rose to the level of indoctrinating or preeducating the prospective jurors. As we noted above, the thrust of the questioning sought to determine whether the prospective jurors were free from bias or prejudice. Such is the purpose of *voir dire*. *Gowler v. Ferrell-Ross Co.*, 206 Ill. App. 3d 194, 207, 563 N.E.2d 773 (1990).

■ Finally, plaintiff also claims that the *voir dire* conducted by Conrail provided prospective jurors with an incomplete and misleading characterization of the law as it related to cross bucks. Specifically, plaintiff contends that the trial court allowed a discussion concerning the adequacy of cross bucks, but failed to instruct the jury that the law imposes a duty on the railroad to install additional protection devices at extrahazardous crossings. We reject this argument for two reasons.

First, Conrail correctly points out that this argument has been waived because plaintiff neither raised the specific issue during *voir dire* nor identified the alleged error in a posttrial motion. "Failure to raise objection at trial or during post-trial proceedings results in waiver of the right to raise the issue on appeal." *Limanowski v. Ashland Oil Co.*, 275 Ill. App. 3d 115, 118, 655 N.E.2d 1049 (1995). Specifically, failure to object to an alleged error during *voir dire* or to object at the conclusion of jury selection results in a waiver of the issue on appeal. *Kotvan*, 321 Ill. App. 3d at 750.

Here, the record reveals that during *voir dire*, plaintiff did not object on the basis that prospective jurors had been misled in terms of defendant's characterization of the law as it related to the presence of cross bucks. Instead, plaintiff objected to the "line of questioning" raised by counsel concerning cross bucks and to the evidence of cross bucks being introduced prior to trial. In the objection, plaintiff's counsel did not indicate that counsel for Conrail had misled the prospective jurors by making only a partial disclosure of the law as it related to cross bucks. Thus, plaintiff did not make an objection during *voir dire* on this particular issue.

Further, the record does not include plaintiff's posttrial motion, and we are unable to determine whether an objection to this specific issue was even raised by plaintiff in that motion. Due to plaintiff's failure to object to the alleged error at trial, we conclude that the issue has been waived. *Limanowski*, 275 Ill. App. 3d at 118.

Second, as pointed out above, the record reveals that Conrail did not raise the issue of cross bucks as an adequate means of protecting railroad crossings. Instead, the subject was raised by a prospective juror. As a result, the presence of cross bucks at the intersection was inquired into by both parties. We have already found that none of defense counsel's questions indoctrinated the jury or deprived plaintiff of a fair trial, and we reject plaintiff's argument that the jurors should have been instructed during *voir dire* concerning a duty imposed on railroads pertaining to extrahazardous crossings.

Based upon all of the above, we conclude that the trial court did not err during *voir dire* by allowing the questions posed by defense counsel. We further determine that plaintiff was not denied a fair trial.

The judgment of the trial court is affirmed.

Affirmed.

GORDON and COUSINS, JJ., concur.