SECOND DIVISION

May 28, 2002

No. 1-99-2121

LEANN M. RUB, Exe'r of the Estate,

of Howard G. Rub, Jr., Deceased, and 

LEANN M. RUB, Indiv., 

Plaintiffs-Appellants,

v.

CONSOLIDATED RAIL CORPORATION,

Defendant-Appellee.
 

))))))))))

)

Appeal from the

Circuit Court of

Cook County

93 L 12091

Honorable

Thomas E. Flanagan,

Judge Presiding.

JUSTICE McBRIDE delivered the opinion of the court:

On November 25, 1992, Howard G. Rub, Jr. (Rub), was killed  when a train owned and operated by defendant-appellee Consolidated Rail Corporation (Conrail) collided with his vehicle.  The accident occurred at the intersection of Morris Road and the Conrail tracks in Dwight, Illinois.  Leann Rub (plaintiff), widow of Rub, filed a wrongful death action against Conrail in her individual capacity and on behalf of the estate of Howard G. Rub, Jr.  Among other allegations, Leann Rub alleged in her second amended complaint that the Morris Road crossing was improperly maintained by Conrail, that Conrail failed to provide adequate warning of approaching trains at the crossing, and that the operators of the train at issue were negligent by failing to slow the train to avoid a collision with Rub's vehicle.  Conrail responded by contending that Rub was contributorily negligent in causing the collision that resulted in his death.  A 
jury returned a verdict in favor of Conrail, and the trial court entered a judgment on the verdict against Leann Rub and the estate of Howard G. Rub, Jr., on November 27, 1997.  Plaintiff filed a post trial motion, which was denied by the trial court on May 28, 1999.  Plaintiff now appeals.

Several questions are raised on appeal.  First, whether the trial court erred during 
voir
 
dire
 when it allowed counsel for defendant to question prospective jurors on facts not yet in evidence.  The second, third, fourth, and issues are discussed in the non published portion of this opinion.
  Second, whether the trial court erred by giving certain jury instructions.  Third, whether the trial court erred by excluding evidence as to the extrahazardous nature of the Morris Road crossing.  Fourth, whether the trial court gave the jury improper limiting instructions that were prejudicial to plaintiff.
  Fifth, whether the cumulative effect of the errors denied plaintiff the right to a fair trial. 
 We state the following background facts. 

 On the evening of the accident, Rub was driving southbound on Morris Road at approximately 55 miles per hour.  The Conrail train tracks run east to west and cross Morris Road at a perpendicular angle.  The evening was overcast and the blacktop pavement was wet.  Approximately 390 feet north of the intersection, a circular advance warning sign with a yellow background was posted displaying a black X and a black RR, indicating to approaching motorists that a railroad crossing was ahead.  At the crossing itself, a cross buck sign was posted.  A cross buck sign is a cross on a wooden post that indicates the presence of a railroad crossing.  There were no flashing lights at the intersection, no gates, and no lights designed to illuminate the grade crossing.  The grade was elevated at the intersection.

As Rub approached the intersection, a westbound Conrail train consisting of two engines and 44 freight cars was advancing on the same crossing at 40 miles per hour.  James Grimes, the train's engineer, testified the trains lights were on.  He also stated  that he saw Rub's vehicle approaching the intersection at the same distance and the same rate of speed.  He said that he became concerned because it did not appear that Rub was going to stop.  Grimes stated that Rub did not seem to respond to a whistle sequence he had blown in order to warn him of the approaching train.  He further testified that he began a series of short blasts on the whistle up to the impact with Rub's vehicle.  Also prior to impact, Grimes said that he threw the emergency brake on the train before Rub reached the cross bucks at the intersection.  The record  revealed that Grimes and the train's conductor, Charles Rice, were reluctant to put the train into emergency because they feared derailment of the train, their safety, and the safety of the public in the surrounding area.  Rice testified that it was unsafe to activate the emergency brake and risk putting the train into emergency when Rub had plenty of time to stop.      

The record reveals that Rub continued to proceed to the intersection.  His vehicle was hit broadside by the locomotive and the collision resulted in his death.  The evidence showed no indication of braking marks or skid marks anywhere in the intersection.   

In plaintiff's case in chief, Daryl Holt, then president of the Village of Dwight, testified that he became involved in negotiating the cleanup of overgrown brush at the intersection which made the crossing difficult to see.  He also stated that headlights of trains were difficult to see because they blended into the background lighting in the area.  Holt said that Conrail had not remedied these problems prior to Rub's accident.  

Two Dwight residents who lived in close proximity to the intersection testified that they never heard the train's whistle blow. 

In addition, Tony Montgomery, a former employee of Rub, testified that he was driving in another car closely behind Rub's auto at the time of the accident.  He said that he neither saw nor heard the train approaching until it struck Rub's vehicle.  

John Edward Baerwald, one of plaintiff's expert witnesses, testified that the surrounding sources of light from homes and other public lights camouflaged the headlights of the on-coming train.  He also characterized the crossing as extrahazardous as defined by railroad engineers.  Baerwald further stated that, at minimum, the crossing should have had two alternately flashing red lights "or [,] more desirably [,] flashing lights plus *** short arm gates *** that drop down and close off the approach lanes."  

Henry Lowell Lazara, a specialist in forensic lighting, also testified for plaintiff.  He stated that he inspected the intersection at Morris Road and determined it to be an "unlighted area."  

Michael Massie, plaintiff's railroading expert, testified that Grimes and Rice were negligent in their failure to apply the train's brakes.  He specifically stated that Grimes could have slowed the train down to 35 miles per hour in the distance to the crossing, which would have allowed Rub's vehicle to clear the track.

To the contrary, Conrail's expert witness, Thomas Burnes, an engineer, stated that he had inspected the intersection on four separate occasions.  He said that the headlamps of locomotives he observed were clear and distinctly different from any of the background lights.  He further testified that, in his opinion, there were no material obstructions to visibility that would have prevented a motorist from seeing and identifying an approaching train.  Thus, he concluded that a motorist would have had an opportunity to observe the train and to take evasive action if necessary.  Burnes said that there are certain factors that make an intersection extrahazardous, specifically, where the hazard is so intense or unusual that it exceeds the capability of a motorist, driving in due care, to appreciate the risk involved and to exercise the appropriate level of caution.   He further stated that he did not characterize this intersection as extrahazardous because crossing it was not beyond the capabilities of motorists that were operating their vehicles in due care. 

William Egan, a Conrail employee in charge of the engineer training school at the company, said that Grimes and Rice maintained a proper lookout prior to the accident, properly implemented the warning devices on the locomotive, and appropriately put the train into emergency.  He further stated that "you never put a train into emergency unless you know you're going to hit something."  

After all the evidence had been presented, the jury returned a verdict in favor of Conrail.  Plaintiff does not allege that the jury's verdict was against the manifest weight of the evidence, but she claims that numerous errors made by the judge below warrant a new trial. 

The first issue raised on appeal is whether the trial court conducted a proper 
voir
 
dire
.  We have stated:

"The purpose of 
voir
 
dire
 is to assure the selection of an impartial jury, free from bias or prejudice.  [Citation.]  The trial judge has the primary responsibility for initiating and conducting 
voir
 
dire
, and the scope and extent of 
voir
 
dire
 are within his sound discretion.  [Citation.]  Upon review, an abuse of discretion will be found only if the trial judge's conduct prevented the selection of an impartial jury."  
Dixson v. University of Chicago Hospitals & Clinics
, 190 Ill. App. 3d 369, 376, 546 N.E.2d 774 (1989). 

Also, it may be error for the court to fail to curtail 
voir
 
dire
 that becomes an attempt to indoctrinate or preeducate jurors or to obtain a pledge as to how they would decide under a given set of facts or determine which party they would favor in litigation.  
Gasiorowski v. Homer
, 47 Ill. App. 3d 989, 992, 365 N.E.2d 43 (1977).  

Plaintiff argues that the trial judge improperly permitted  Conrail to discuss facts not yet in evidence with prospective jurors.  Specifically, plaintiff complains of defense counsel's reference to the cross bucks at the Morris Road intersection and subsequent attempts to solicit the venire persons' views on the protection cross bucks afford to motorists.  Plaintiff also contends that the 
voir
 
dire
 conducted by Conrail provided jurors with an incomplete and misleading characterization of the law as it relates to cross bucks.  As a result of these errors, plaintiff argues the trial judge should have taken corrective action in the form of calling for a new venire or providing a cautionary instruction.  According to plaintiff, the trial court's failure to do so resulted in the denial of a fair trial.

We first address plaintiff's complaint that defense counsel improperly introduced a fact, specifically the presence of cross bucks at the Morris Road crossing, that had not yet been introduced as evidence.  

At the outset of 
voir
 
dire
, the court addressed the prospective jurors with the following overview of the case:

"So I am in a position to tell you in general what the case is about, but I do not want you to think that I am telling you evidence because I don't tell you evidence.  What the lawyers say in fact is not evidence.  Evidence comes from up here under oath. 

* * *

Basically, a review of the type of case is as follows: Howard Rub was operating a car on Morris Road in Dwight, Illinois.  There was a collision between his car and a Conrail train at a railroad crossing.  As a result, Howard Rub was killed.  The plaintiff alleges this incident was a direct and a proximate result of negligence on the part of the railroad, and the defendant railroad denies that any conduct on its part constituted negligence."

A review of the record reveals that the subject of whether the crossing was marked was first raised by prospective juror
, Francis Prather
, who said:

"[MR. PRATHER]: I don't know whether I can ask a question.

[THE COURT]: Well, you can ask me anything you want.

Q. Was it a marked or an unmarked crossing?

A.  That I don't know yet, but we are going to find out that evidence as it develops under oath from up here, but I am wondering not how you will decide it but whether in a general sense this kind of case gives you a hard time?

[MR. PRATHER]: I don't know any reason why."

Before defense counsel asked any questions of Prather, plaintiff's attorney elicited the following:

"Q.  *** [S]ince this is a train collision case, could you tell me just a little about the incident where your mother-in-law was killed or injured?

A.  This was in Montana, and she was hit at an unmarked crossing and had hip replacement and walked with a limp for a number of years until she passed away."

Plaintiff's attorney then continued:

"Q.  When you say unmarked, are you talking about –

A. ***  It was probably the crosses but not the – not lights.

* * *

Q. *** Do you feel that there is anything about that incident that would prevent you from being fair and impartial in this case?

A.  I don't believe so, no."

In response to a question from plaintiff's counsel, the next prospective juror, Rosevetta Stan, said:

"A. *** [T]he big guy is always guilty, and he should pay, like the railroad if that is what it is.

Q. *** [Y]ou have a feeling that the railroad because they are big they should pay? ***

A.  Yeah.

Q.  You are not just saying that because you want to get out of here and get back to your cosmetology business?

A.  No, this is the truth."  

Stan also said that crossing the train tracks every day made her afraid.  After examining several other prospective jurors, plaintiff's counsel tendered the panel to defense counsel.  After examining several prospective jurors, defense counsel then asked Prather:

"Q.  You discussed somewhat this morning the circumstances of the railroad accident that involved your mother-in-law some years ago in Montana?

A.  Yes.

Q.  And early on before any of the lawyers asked you any questions, when the judge was asking you questions, you in essence asked him a question about was this a protected or unprotected crossing.  Do you remember that?

A.  Right.

Q. *** When you told us about the incident involving your mother-in-law, you indicated that had a cross bucks only protection sign at the crossing, correct?

A.  Right.

Q. Now, is that something that you believe or feel is not a protected crossing or is not sufficient or is not adequate?

* * *

Q.  Okay.  My question would be then if – would you consider it to be an unsafe condition at a railroad crossing if the protection that existed there was simply a cross bucks instead of lights, flashers, things of that nature?

A. Not if there were -- there was sufficient vision both ways.

* * *

Q. *** Is there anything with respect to the circumstances of your prior experience or your general knowledge that would prevent you in this case from weighing the evidence, listening to both sides and then rendering a fair and impartial verdict based upon the facts and the evidence in the laws as instructed to you by the court?

A.  I would have no problem with that, no, not really."

Plaintiff's counsel raised no objections to these questions posed by the defense attorney.

Counsel for plaintiff then asked Prather the following question:

"Q.  Now in this particular case if you hear evidence that the crossing was protected by a cross bucks only, will you give us your assurance that you'll listen to all of the evidence and you'll make a fair determination based on the law that Judge Flan[a]gan gives you the crossing was adequate in this case"?

A.  Yes."

Later during 
voir
 
dire
, defense counsel asked Beth Larson, a prospective juror, the following question:

"Q.  We talked a little bit earlier concerning cross bucks protection railroad with Mr. Prather, and I asked him questions about whether he had a problem with that based upon the history of the accident with his mother-in-law.  Do you have any feelings one way or the other that just a crossbuck at a railroad crossing is not good enough and there has to be something else no matter what?

A.  I don't think so.  I mean I certainly like the ones that have the lights better for my sake, but, you know, I don't think -- I guess the answer is no.

Q.  What I need to know is whether you have any preconceived notion or preconceived bias that there has to be more protection at the crossing than just a cross buck, and that in and of itself means that there's a problem and something else should be there and if it isn't, then there's guilt whether it's negligence or fault.

A.  I don't think it's a question of negligence, no."

Plaintiff's counsel made no objections to these two questions posed by defense counsel.  The panel of prospective jurors was then accepted by both sides, excused for the day, and instructed to return to the jury room the next day.

During the selection of the next four jurors, plaintiff's attorney asked Mr. Shannon:

"Q.  You heard some questions about the cross bucks or cross buck crossings, correct?

A.  Yes.

Q.  You understand that in this case you may have to decide whether or not in this particular crossing cross bucks were adequate to protect a crossing or whether the crossing needed additional protection.  Will you listen to all of the evidence fairly on that before deciding?  

A.  Sure."

Plaintiff's counsel excused Mr. Stevich, a potential juror, and then examined the next prospective juror, Kathleen Kushnapor.  During earlier questions posed by the court, Kushnapor revealed that her brother had been in a car accident and had suffered a crushed pelvis.  As result of the accident, she stated that her brother always walked with a limp.  Plaintiff's attorney asked Kushnapor the following questions:

"Q.  There were some questions asked about railroad crossings and crossings that don't have flashers, they just have cross bucks.  Do you remember those questions?

A.  Yes.

* * *

Q.  There's going to be an issue in this case about whether or not the railroad crossing involved in this case had adequate protection.  Will you listen to all of the evidence on that issue and then make up your mind after hearing all the evidence?

A.  Yes.

* * *

Q.  You'll give both sides a fair trial?

A.  Yes."

Plaintiff's counsel indicated that he would accept the panel of Ms. Kushnapor, Ms. Lingo, Mr. Shannon, and Mrs. Spirodovich. 

Defense counsel then asked Ms. Lingo a series of questions about a car accident in which she was injured.  During plaintiff's questioning, Lingo revealed that, as a result of the accident, she had refused to drive since the age of 14.  Defense counsel asked whether she had any "preconceived ideas" because of the accident and whether there was problems with any of the signals at the intersection where the accident took place.  Specifically,  defense counsel asked:  

"Q.  Now, based upon your experience as a non-driver but being a passenger and observing traffic and situations that develop, do you have, again, feeling that would shape you one way or another in terms of protection of railroad crossings?  In other words, do you believe that just having a cross buck sign at a crossing where a railroad goes isn't enough and there should be something there no matter  what?

A.  I think there should be gates and lights no matter what.

Q.  Based on that, would you be able to be fair in this situation where there was not a situation where there were lights and gates?

A.  I would hope I could be, but I couldn't guarantee.  My belief there should be gates and lights, but not having ever done this, I don't know. 

Q.  So it seems to me what you are saying is you have a preconceived notion or preconceived notice that–

A.  I have a reservation about not having gates.

Q.  And that they well might make it difficult for you to be fair and impartial here?

A.  Possibly, yes."

Outside the presence of the jury, defense counsel moved to dismiss Lingo for cause.  Despite her statements above concerning an inability to be fair, plaintiff's counsel objected that she be excused for cause.  Based upon Lingo's statements that she might not be fair, the trial court dismissed her for cause.  We also note that up to this point, plaintiff's counsel had made no objection to the questions posed by defense counsel concerning cross bucks. 

Once the panel had been tendered to the defense, defense counsel then asked venire person Smith and venire person Shannon if they had any preconceived notion or preconceived bias about the concept of adequate protection at a railroad crossing.  The same question was posed to venire person Kushnapor, who responded that the presence of only cross bucks at an intersection might possibly make it difficult for her to be fair and impartial.

After a similar question had been asked to venire person Spirodovich, a side bar was requested by defense counsel.  At the side bar, defense counsel moved to dismiss Kushnapor for cause.  When the court asked for a response to the motion to excuse, plaintiff's counsel stated for the first time:

"I want to make an objection to the line of inquiry [defense] counsel continues to follow.  I think its incorrect for him to emphasize a bit of evidence to the exclusion of everything else and try and extract from the jurors a commitment or some type of frame of mind as to what they are going to do." 

 In response, the court stated:

"It's hard to control because it all started with a juror postulating the question about whether it was a cross bucks only type of a question.  I responded to the juror along the lines of that he would get the evidence eventually, and counsel having gotten that lead in from the juror mentioned to him now when the judge was speaking to you, you mentioned something about was it cross bucks only.  Would you mind telling us how that affects your thinking which I think was perfectly permissible.  He brought it up, and I think counsel had a right to follow it up."

Plaintiff's counsel then contended that defense counsel had been "brow beating" the jurors.  The court immediately disagreed with this claim and defense counsel pointed out that he was not seeking a commitment from any of the jurors.
  The trial judge then denied defendant's motion to excuse Kushnapor for cause.  Plaintiff's counsel asked that no further questions on the subject of cross bucks be asked of Kushnapor.  The trial judge indicated that he did not believe the questioning had been improper up to that point and overruled plaintiff's request.  Defense counsel chose not to inquire further and then asked the trial court that  Kushnapor be peremptorily excused.  Immediately after this discussion, the trial court dismissed Kushnapor. 

After one prospective juror said that he did not think he could be fair to the railroad, another potential juror, Frances Rogers, was examined by the court.  She also indicated some concern about serving as a juror.  Specifically, she said that she never drove a car and that there should be lights at every railroad crossing.  Counsel for the defense then asked Rogers the following question:

"Q.  And if you think there should be [a light] at every crossing, if you find out in this particular instance that there isn't one, is that going to have an impact on you in the way that you are going to view the evidence and the facts of the case?

A.  No, not really."

The defense then requested that Ms. Rogers be peremptorily excused, and the trial court granted the request. 

After Janet Kohn, a prospective juror, told the court that she felt that there should be gates at railroad crossings, defense counsel asked her the following question:

"Q.   ***, [I]f the fact is that this crossing that was involved in this incident is a cross buck only protected crossing, would you be able to consider all of the other factors in conjunction with that towards making your decision, or would it simply be because of your feeling about protection, cross bucks is it and that's the determinative factor.

A.  I think it is pretty necessary.  I do think the gates are necessary to prevent anything to happen.  I do feel that way."

Plaintiff's counsel did not object to this particular question asked by defense counsel.  Ultimately, defense counsel used a peremptory challenge to excuse Ms. Kohn.  

Next, defense counsel asked prospective juror, Leona Harris, the following questions:

"Q. *** You have indicated that you can be fair and impartial to both sides, I want to ask you specifically if there is any issue involving railroad protection and situations of crossing that presents a problem to you with respect to cross bucks as opposed to flashers as opposed to gates; does that create a problem for you?

A.  No.

Q.  And the fact that in the particular circumstances here where there was cross bucks only as opposed to flashers or gates,  that doesn't predispose you one way or the other?

A.  Not at all.

Q.  You look at the big picture, hear the facts and here the evidence, see where it comes down?

A.  Exactly." 

Plaintiff's counsel made no objection to these questions.

Moments later, plaintiff's counsel asked Harris:

"Q.  My question to you is if, in fact, the evidence shows in this case that the crossing where Mr. Rub was killed was not adequately protected, that cross bucks weren't enough, would you have any hesitancy in returning a verdict for the plaintiff if that's the case after hearing all the evidence.

A.  No."

After Leona Harris was examined further, she was accepted as a juror, and the second panel was sworn in.

During the selection process for the third panel, Anita Long, a prospective juror, asked defense counsel: "I never heard the term cross bucks.  I don't know what you are talking about."  Defense counsel responded:

"Q.  Cross bucks are a sign that's up at a railroad crossing that indicates – it is a cross on a wooden post that indicates the presence of a railroad crossing.  No flashing lights and no gates. 

***, [T]here is [
sic
] a lot of them.

A.  *** I'm not that familiar with country roads.

Q. *** [W]ould that impact on your ability to be fair and impartial in this case?

A.  No."  

At the time, plaintiff's counsel did not object to the above question.  Later in the proceedings, however, the following conversation occurred between plaintiff's counsel and the trial court:

"MR. GOMIEN: [Plaintiff's counsel] But if you will recall, counsel in his voir dire kept talking about crossbucks, and in response to one lady's question said there are many of them.

THE COURT: Yes. That was an unfortunate comment."

Defense counsel then asked Darell Wiley, a prospective juror:

"Q.  So as you are sitting here today and we are having this conversation, what you are telling me is that just because a crossing has cross bucks and not gates and flashers, you will just take that into consideration along with the other factors?

A.  Yes.  Among other factors, yes."

Plaintiff's counsel did not object to this question.

Later in the proceedings the defense attorney asked Patrick Kennedy, a prospective juror, the following questions: 

"Q.  You, obviously heard we are talking about a cross buck protected crossing as opposed to other types of protection.  Is that a problem to you?

* * *

Q. *** [W]ould [the presence of only cross bucks] impact your ability to be fair and impartial and look at all the factors involved in this case and make a decision as to –

A.  As far as being fair and impartial, no."

Plaintiff's counsel did not object to these questions.

Later in the proceedings, Anita Stone, a prospective juror, told the court that there should not be any rail road crossings without flashers.  Defense counsel then asked: 

"What is your specific feeling with respect to protection at railroad crossings in general?  What do you think should be there?

A.  I think you should have not only flashers, there should be guardrails devised in a way that people can't get around them and maybe even speakers talking to them.

* * * 

Q. And would it be fair to say that brings you here with a pre-conceived notion or pre-conceived bias if a crossing doesn't have that type of protection, well, then there is a problem?

A.  They should be there.

Q.  So would the answer to that question be a yes, you have pre-conceived bias on that issue?

A.  Well, yes."

Plaintiff's counsel did not object to these questions.  Based on the answers given by Stone, the defense sought to dismiss her for cause.  The trial judge dismissed her for cause.

Cheryl Utecht-Themer, another prospective juror, told the trial court, "my preference would be that at the crossing areas   *** there is protection beyond cross bucks."  She was then asked the following question by defense counsel,

"Q.  At the invitation of the judge, you volunteered your thoughts concerning crossing protection.  Could you tell me a little bit more about that, *** what your thoughts or feelings are about the types of protection or what is or is not appropriate or what you think should or should not be there?

A.  Well, obviously, if more protection at a crossing could save a life, that's you know, whatever it costs for those protectors or whatever is certainly worth it.

* * *

Q. *** You understand that there is two sides to every story  and it is important to weigh both sides before you start weighing the evidence?

A.  Yes."

Plaintiff's counsel did not object to these questions posed by defense counsel.

On appeal, plaintiff argues that all of the questions asked by defense counsel above were improper because the prospective jurors opinions concerning the presence of protection at railroad crossings were solicited before the evidence had been presented.

We disagree for several reasons.

First, plaintiff's counsel, with the exception of one instance, failed to object at the time the complained-of questions were raised by defense counsel.  We note that plaintiff did make a general objection to the defense's line of questioning during the side bar where the defense sought to dismiss Kathleen Kushnapor for cause.  " ' Preservation of a question for review requires an appropriate objection in the court below [citation], and failure to object constitutes waiver.'  [Citation.] "  
Kotvan v. Kirk
, 321 Ill. App. 3d 733,  750, 747 N.E.2d 1045 (2001).  A review of the entire record reveals that plaintiff failed to specifically object to most of the questions posed by defense counsel.  Thus, plaintiff has waived the issue.

Second, waiver aside, a review of the record reveals that the questions asked by defense counsel were proper.  The supreme court has stated:  

"The purpose of 
voir
 
dire
 is to assure the selection of an impartial panel of jurors who are free from bias or prejudice. [Citations.]  Under our Supreme Court Rule 234 [citation] the primary responsibility for initiating and conducting the 
voir
 
dire
 examination lies with the trial judge [citation], and the scope and extent of the exam rests within his discretion. [citation]"  
Kingston v. Turner
, 115 Ill. 2d 445, 464-65, 505 N.E.2d 320 (1987). 

177 Ill. 2d R. 234.  When questioning of prospective jurors is turned over to counsel, it has been held that it is properly within the scope of questioning to expose any hidden bias or prejudice of a prospective juror.  
Friedman v. Park District of Highland Park
, 151 Ill. App. 3d 374, 382, 502 N.E.2d 826 (1986).    

We find that the questions posed by defense counsel were appropriately designed to expose any latent prejudice by jurors against railroad crossings where no lights, gates, or flashers were present.  In 
Scully v. Otis Elevator Co.
, 2 Ill. App. 3d 185, 198, 275 N.E.2d 905 (1971), the plaintiff's counsel used a figure of $600,000 in framing questions to prospective jurors during 
voir
 
dire
.  On appeal, the defendant claimed that these questions were prejudicial because the use of this figure indoctrinated the jurors into thinking that an award for a lesser sum would be unfair.  The appellate court found that the questions propounded by the plaintiff's counsel were appropriate because they were designed to expose any latent prejudice among the prospective jurors against large verdicts.  
Scully
, 2 Ill. App. 3d at 198. 

In our view, the questions asked by defense counsel in the instant case were similarly designed to expose a latent prejudice among prospective jurors against railroad crossings where lights, gates, and flashers were not present.  The record clearly demonstrates that many prospective jurors had a preconceived bias against crossings where only cross bucks were present. 

Further, the record reveals that the questions complained of were designed to explore this communicated preconceived bias among certain prospective jurors against the railroad.  Defense counsel was entitled to inquire about any hidden bias or prejudice demonstrated by these prospective jurors.  We also conclude that   the questions posed by defense counsel did not indoctrinate the jurors.  Instead, the questions were appropriately designed to expose a latent prejudice against railroad crossings only marked by cross bucks.  An examination of the 
voir
 
dire
 in its entirety demonstrates that the prospective jurors who demonstrated a preconceived bias against crossings that lacked, lights, gates, flashers, or guardrails, and who further indicated an inability to be fair and impartial as a result of this bias, were dismissed.  On the other hand, jurors who communicated an ability to be fair, impartial to both sides, and to weigh all the evidence were not dismissed.  We therefore conclude that the questions posed by defense counsel served the proper purpose of 
voir
 
dire
 and neither indoctrinated the prospective jurors nor prejudiced plaintiff.

Third, we note that, on several occasions during 
voir
 
dire
 questioning, plaintiff's counsel discussed the adequacy of cross bucks as the only measure for ensuring safety at the Morris Road crossing.  As noted above, specifically in regard to questioning Leona Harris, plaintiff's counsel said:

"Q.  My question to you is if, in fact, the evidence shows in this case that the crossing where Mr. Rub was killed was not adequately protected, that cross bucks weren't enough, would you have any hesitancy in returning a verdict for the plaintiff if that's the case after hearing all the evidence [?]"

This is similar to the kind of question concerning cross bucks that plaintiff suggests was improperly posed by defense counsel.  A plaintiff is precluded from  challenging error that he injected into the proceedings.  
Ervin v. Sears, Roebuck & Co.
, 65 Ill.2d 140, 144-45, 357 N.E.2d 500 (1976).  Because plaintiff participated in the line of questioning and did not object to many if not most of the questions now complained of, plaintiff is prohibited from challenging the alleged error on appeal.

Plaintiff also claims that most of the prospective jurors sat throughout the entire 
voir
 
dire
 and were likely tainted by defense counsel who "talked endlessly about cross bucks and suggested that anyone who did not regard cross bucks as adequate protection was unfit to sit on the jury."  As a result, the plaintiff suggests that the entire venire should have been excused.  Based on a review of the entire 
voir
 
dire
, we disagree with plaintiff's position.  

The record reveals that after the first panel of jurors was selected, the jurors were excused and told to return the next morning.  After the second panels was selected, those jurors were  also excused from the courtroom and did not witness the remaining  
voir
 
dire
.  Thus, plaintiff's argument that the jury was somehow tainted by exposure to defendant's questions is not persuasive.  

Further, as we noted above, the tenor of the questions raised by defense counsel focused on exposing a latent bias from jurors who communicated a preconceived disposition against the railroad.  With regard to a majority of prospective jurors, defense counsel ended his examination with questions concerning whether that prospective juror could be fair and impartial.  Thus, even if many prospective jurors sat through the entire 
voir
 
dire
, they would have observed that the jurors who were excused were those who demonstrated that they could not be fair and impartial to both sides.  Therefore, we are not persuaded by plaintiff's argument that the jury was tainted and should have been excused.

Additionally, the authority relied upon by plaintiff is distinguishable.  In 
Christian v. New York Central R.R. Co.
, 28 Ill. App. 2d 57, 59, 170 N.E.2d 183 (1960), a 13-year-old boy was severely injured when several railroad torpedoes with which he was playing exploded.  The torpedoes were obtained by the boy's friends from defendant's obsolete steam locomotives.  

During 
voir
 
dire
, counsel for plaintiff was permitted to interrogate several jurors upon specific points of law.  With respect to one juror, the venireman told the court that he had handled railroad torpedoes, that he knew they were dangerous, and that he would not make a very good juror.  The juror was not excused and was further questioned by the court.  The questioning revealed a statement from the juror that he might not be impartial because he knew the degree of care necessary for handling railroad torpedoes.  Despite more than one disqualifying statement, the court turned the juror over to questioning by the plaintiff's counsel, which yielded this answer from the juror: " 'I will tell you that the about it, I know the care of torpedoes and there must be neglect someplace, and I just honestly feel that I wouldn't make a good juror.'"  
Christian
, 28 Ill. App. 2d at 66.  The trial court permitted plaintiff's counsel to ask the following questions before this prospective juror was excused: " 'You feel because you have knowledge of these things and the danger that there is in it, you know to be in them, that is what you are saying; the way they have to be cared for, if you got on the jury, you would be prone to be against these defendants because these things are involved[?]' "  
Christian
, 28 Ill. App. 2d at 66.
 
 

The appellate court found that "counsel for plaintiff was permitted to run rampant in the selection of this jury."  
Christian
, 28 Ill. App. 2d at 67.  Further, the court stated, "[t]he main effort of [plaintiff's] examination was to indoctrinate, to persuade and to control [the selection of prospective jurors]."  
Christian
, 28 Ill. App. 2d at 67.  As the defense observed the plaintiff's attempt to convert the jury panel to his beliefs, defense counsel "naturally launched upon a reconversion when his time came."  
Christian
, 28 Ill. App. 2d at 67.
  Because of the clear abuse of 
voir
 
dire
 examination by counsel for both parties, the court found that reversal was warranted.  
Christian
, 28 Ill. App. 2d at 68-69.
   

Christian
  is distinguishable because the main effort of the plaintiff in that case was to indoctrinate the jury.  In the instant case, the record does not demonstrate an abuse of 
voir
 
dire
 by defense counsel.  Instead, the evidence indicates an effort by defense counsel to uncover bias among perspective jurors.  We find no abuse of 
voir
 
dire
 by defense counsel in the instant case.   

In 
Gasiorowski
, the plaintiff, a pedestrian, suffered personal injuries when she was struck by an automobile while crossing Belmont Avenue in Chicago mid-block.  The jury returned a verdict in favor of the defendant-driver, finding that the plaintiff was guilty of contributory negligence.  During 
voir
 
dire
, plaintiff's counsel sought to ask prospective jurors whether they had ever seen pedestrians crossing streets in mid-block and whether they, as pedestrians, had themselves ever crossed streets in mid-block.  The trial court did not permit counsel to ask these two questions.  The plaintiff, among other things, appealed that decision.  The appellate court found that the trial court was well within its discretion to prohibit such questions because: 

"Questions which tend to put prospective jurors in the place of the parties to the litigation open a wide range of possibilities for indoctrination or pre-education of jurors, and lend themselves all too easily to attempts to obtain some positive indication as to which party the jurors might favor." 
Gasiorowski
, 47 Ill. App. 3d at 994.

We find the facts in 
Gasiorowski
 are distinguishable from those in the instant case.  In 
Gasiorowski
, the court prohibited plaintiff's counsel from asking two questions on 
voir
 
dire
.  Here,  the court permitted defense counsel to ask certain questions to prospective jurors.  We conclude that these questions did not taint the selection of an impartial jury and that the trial court did not abuse its discretion in allowing the inquiry. 

While the trial court itself acknowledged that it may have been mistaken in allowing questions by counsel for both sides on the topic of cross bucks, it determined that such questioning was not prejudicial and did not deny plaintiff a fair trial.  We note that the trial court reviewed its own conclusion and evaluated significant portions of the 
voir
 
dire
 in a 24-page order that denied plaintiff's post trial motion.  While the questioning of defense counsel on a few occasions arguably went beyond ascertaining whether a juror was free from bias or prejudice, we do not conclude that it rose to the level of indoctrinating or preeducating the prospective jurors.  As we noted above, the thrust of the questioning sought to determine whether the prospective jurors were free from bias or prejudice.  Such is the purpose of 
voir
 
dire
.  
Gowler v. Ferrell-Ross Co.
, 206 Ill. App. 3d 194, 207, 563 N.E.2d 773 (1990).

Finally, plaintiff also claims that the 
voir
 
dire
 conducted by Conrail provided prospective jurors with an incomplete and misleading characterization of the law as it related to cross bucks.  Specifically, plaintiff contends that the trial court allowed a discussion concerning the adequacy of cross bucks, but failed to instruct the jury that the law imposes a duty on the railroad to install additional protection devices at extrahazardous crossings.  We reject this argument for two reasons.

First, Conrail correctly points out that this argument has been waived because plaintiff neither raised the specific issue during 
voir
 
dire
, nor identified the alleged error in a posttrial motion.  "Failure to raise objection at trial or during post-trial proceedings results in waiver of the right to raise the issue on appeal."  
Limanowski v. Ashland Oil Co.
, 275 Ill. App. 3d 115, 118, 655 N.E.2d 1049 (1995).
  Specifically, failure to object to an alleged error during 
voir
 
dire
 or to object at the conclusion of jury selection results in a waiver of the issue on appeal
.  
Kotvan
, 321 Ill. App. 3d at 750.     

Here, the record reveals that during 
voir
 
dire
, plaintiff did not object on the basis that prospective jurors had been misled in terms of defendant's characterization of the law as it related to the presence of cross bucks.  Instead, plaintiff objected to the "line of questioning" raised by counsel concerning cross bucks and to the evidence of cross bucks being introduced prior to trial.  In the objection, plaintiff's counsel did not indicate that counsel for Conrail had misled the prospective jurors by making only a partial disclosure of the law as it related to cross bucks.  Thus, plaintiff did not make an objection during 
voir
 
dire
 on this particular issue.  

Further, the record does not include plaintiff's posttrial motion, and we are unable to determine whether an objection to this specific issue was even raised by plaintiff in that motion.  Due to plaintiff's failure to object to the alleged error at trial, we conclude that the issue has been waived.  
Limanowski
, 275 Ill. App. 3d at 118.  

Second, as pointed out above, the record reveals that Conrail did not raise the issue of cross bucks as an adequate means of protecting railroad crossings.  Instead, the subject was raised by a prospective juror.  As a result, the presence of cross bucks at the intersection was inquired into by both parties.  We have already found that none of defense counsel's questions indoctrinated the jury or deprived plaintiff of a fair trial, and we reject plaintiff's argument that the jurors should have been instructed during 
voir
 
dire
 concerning a duty imposed on railroads pertaining to extrahazardous crossings.

Based upon all of the above, we conclude that the trial court did not err during 
voir
 
dire
 by allowing the questions posed by defense counsel.  We further determine that plaintiff was not denied a fair trial.  
[The following material is non-publishable under Supreme Court Rule 23.]

We next consider whether the trial court erred by giving certain jury instructions.  Concerning our standard of review, the supreme court has held:
  

"A litigant has the right to have the jury clearly and fairly instructed upon each theory which was supported by the evidence.   [Citation.]  However, it is error to give an instruction not based on the evidence. [Citations.]  The question of what issues have been raised by the evidence is within the discretion of the trial court.  The evidence may be slight; a reviewing court may not reweigh it or determine if it should lead to a particular conclusion. [Citation.]  The test in determining the propriety of tendered instructions is whether the jury was fairly, fully and comprehensively informed as to the relevant principles, considering the instructions in their entirety."  
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83, 100, 658 N.E.2d 450 (1995). 

Plaintiff claims that the trial court erred by giving two jury instructions in addition to Illinois Pattern Jury Instructions, Civil, No. 73.01 (2000), which is specifically devoted to railroad crossing cases.  The instruction stated:

"73.01 Duty of Driver Crossing Tracks 

A railroad crossing is a place of danger.  If you believe from the evidence that as the [plaintiff] [decedent] was approaching the crossing he knew, or, in the exercise of ordinary care should have known, that a train approaching the crossing was so close to the crossing that it would be likely to arrive at the crossing at about the same time as plaintiff's vehicle, then it was the duty of the [plaintiff] [decedent] to yield the right of way to the train."  Illinois Pattern Jury Instructions, Civil, No. 73.01 (2000) (hereinafter IPI Civil, ).  

According to plaintiff, IPI Civil No. 73.01 was the only instruction which should have been given to the jury.  Instead, the trial court, over plaintiff's objection, gave the jury two additional instructions which were tendered by Conrail in conformity with IPI Civil No. 60.01
.
  The first instruction stated the following:

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that:

Whenever any person driving a vehicle approaches a railroad grade crossing such person must exercise due care and caution as the existence of the railroad track across the highway is a warning of danger, and under any of the circumstances stated in this Section, the driver shall stop within 50 feet but not less than 15 feet from the nearest rail of the railroad and shall not proceed until he can do so safely.  The foregoing requirements shall apply when:

***

A railroad train approaching a highway crossing emits a warning signal and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard; or

An approaching railroad train is plainly visible and is in hazardous proximity to such crossing; or

A railroad train is approaching so closely that an immediate hazard is created. 

If you decide that a person violated the statute on the occasion in question, then you may consider the fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a person was negligent before and at the time of the occurrence."

The second instruction stated:

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that: 

No vehicle may be driven upon any highway of this State at a speed which is greater than is reasonable and proper with regard to traffic conditions and the use of the highway, or endangers the safety of any person or property.  The fact that the speed of a vehicle does not exceed the applicable maximum speed does not relieve the driver from the duty to decrease speed when traveling upon any narrow roadway, or when special hazard exists with respect to traffic or by reason of weather or highway conditions.

  If you decide that a person violated the statute on the occasion in question, then you may consider the fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a person was negligent before and at the time of the occurrence."

According to plaintiff, by providing the above instructions in addition to IPI Civil No. 73.01, the jury was informed that Rub had committed multiple motor vehicle violations which "over-emphasized" Conrail's theory of contributory negligence.    

Further, plaintiff claims that trial court ignored the explicit directions on how to use IPI Civil 60.01 by allowing multiple instructions based on the same legal principle.  Illinois Pattern Jury Instructions, Civil, No. 60.01, Notes on Use (2000
). 

We recognize that, "[w]here several instructions embodying the same legal principle are submitted to the court, it may select the one it sees fit and need not repeat the same proposition of law in different language in different instructions."  
Bernardoni v. Hebel
, 101 Ill. App. 3d 172, 177, 427 N.E. 2d 1288 (1981); IPI Civil, No. 60.01, Notes on Use (2000).
  
However, we agree with Conrail that the three instructions set forth above embody sufficiently different legal principles.  As correctly noted by Conrail, IPI Civil No. 73.01 establishes
 a common law duty to yield the right of way to the train.  
To the contrary, the instruction tendered by Conrail based on IPI Civil No. 60.01 establishes a statutory duty upon a motorist to stop his vehicle when a railroad train is approaching so closely that an immediate hazard is created.  This statutory duty is imposed on motorists under section 11-1201 of the Illinois Vehicle  Code.  625 ILCS 5/11-1201 (West 1998).

The second instruction tendered by Conrail refers to a motorist's obligation to reduce his speed when a special hazard exists.  This duty is imposed on motorists by section 11-601(a) of the Illinois Vehicle Code.  625 ILCS 5/11-601(a) (West 1998).  In our view, therefore, the three instructions did not arise out of the same legal principle. 

Even if we were to conclude otherwise, Conrail correctly observes that, "[m]erely because the court restates the law in another instruction does not necessarily mean that the court unduly emphasizes any point in favor of the other."  
Riley v. Johnson
, 98 Ill. App. 3d 688, 695, 424 N.E.2d 842 (1981).  Thus, plaintiff's contention that the inclusion of Conrail's two instructions "over-emphasized" a theory of contributory negligence
 is not persuasive.  
 Furthermore, we note that, "[a]s a general rule, a judgment will not be reversed where the jury instructions 
are faulty
 unless they misled the jury and the complaining party suffered prejudice."  (Emphasis added.)
  
Dabros by Dabros v. Wang
, 243 Ill. App. 3d 259, 269, 611 N.E.2d 1113 (1993).  Thus, even if the instructions were "faulty," reversal would not be warranted unless the jury was misled.  There is no evidence to support that the jury was misled by the instructions in the instant case. 

Plaintiff also argues that the instructions provided the jury with confusing and conflicting information concerning Rub's duty of care.  Specifically, plaintiff claims that the jury was provided three different instructions which required Rub to yield the right of way, to stop, or to reduce his speed in the event of an approaching train.  Plaintiff offers no evidence that the jury was misled by "[t]his parade of different duties."  Furthermore, Conrail was entitled to instruct the jury on its contributory negligence theory.  "[E]ach party is entitled to have the court instruct the jury on its theory of the case that is presented as an issue in the pleadings and preserved in the evidence."  
Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.
, 316 Ill. App. 3d 227, 244, 738 N.E.2d 938 (2000).  Thus, we are not persuaded by this argument.

Finally, plaintiff argues that the second instruction tendered by Conrail, noted above, was not supported by any evidence in the record.  In particular, plaintiff contends that there was no evidence to support the fact that Rub was traveling at an unreasonable rate of speed prior to the collision.  While there was no actual testimony that Rub was traveling at an unreasonable rate of speed, evidence in the record does show that the Conrail train was approaching
 the Morris Road intersection at 40 miles per hour prior to the collision.  Rub's vehicle was traveling at approximately the same rate of speed.  The record further demonstrates that the road was wet and that the evening was dark and dreary.  

The Conrail instruction at issue states that a driver may have the obligation to reduce speed in the event of a special hazard, weather, or highway conditions.  Based on an approaching train, a special hazard, and poor weather conditions, we find that there was sufficient evidence in the record to support this jury instruction, and it, "fairly, fully, and comprehensively informed [the jury] as to the relevant principles."  
Leonardi
, 168 Ill. 2d at 100.  We further conclude that the trial court did not abuse its discretion by providing the instructions tendered by Conrail to the jury.

We next address whether the trial court abused its discretion when it excluded particular evidence concerning the extrahazardous nature of the Morris Road crossing.  The admissibility of evidence is within the sound discretion of the trial court, and its decision will not be reversed on appeal unless that discretion has clearly been abused.  
Leonardi
, 168 Ill. 2d at 92.  

Plaintiff correctly observes that a jury is charged with determining whether extrahazardous conditions are present at a railroad crossing which may impose a duty upon the railroad to provide additional warning devices.  
Brennan v. Wisconsin Central  Ltd.
, 227 Ill. App. 3d 1070, 1080, 591 N.E.2d 494 (1992); 
Merchants National Bank of Aurora v. Elgin, Joliet & Eastern Ry. Co.
, 121 Ill. App. 2d 445, 459, 257 N.E.2d 216 (1970); 
Baker v. Norfolk & Western Ry. Co.
, 120 Ill. App. 2d 296, 303, 256 N.E.2d 887 (1970).  The above authority sets forth a variety of factors that the jury may consider in reaching a determination as to whether a crossing is extrahazardous.  
Brennan
, 227 Ill. App. 3d at 1080;  
Merchants National Bank
, 121 Ill. App. 3d at 456; 
Baker
, 120 Ill. App. 3d at 304.  Specifically, the court held in 
Brennan
:

"Several factors the jury considers in assessing the questions of hazard and protection are population, traffic, physical obstructions to vision, volume and speed of vehicular and train traffic, track arrangement and elevation, width of the crossing, intersecting driveways and roadways, character of the surrounding neighborhood, and the effect to which confusion, incident to the railroad or other business in the area, would have on the sight or hearing of ordinary signals."  
Brennan
, 227 Ill. App. 3d at 1080.

Plaintiff, however, fails to acknowledge the general proposition that evidence that is not relevant, and that would only confuse or mislead the jury, is properly excluded.  
People v. Averhart
, 311 Ill. App. 3d 492, 500, 724 N.E.2d 154 (1999).   Further, although the admissibility of relevant evidence is favored, even relevant evidence may be excluded if its probative value is outweighed by factors such as prejudice, confusion, or the potential for misleading the jury.  
Gill v. Foster
, 157 Ill. 2d 304, 314, 626 N.E.2d 190 (1993).  With these standards in place, we  address the following evidence which plaintiff contends was improperly barred by the trial court.

Plaintiff first claims that the trial court erred by barring evidence of a 60-mile-per-hour federal speed limit which could have applied to the Conrail tracks at the Morris Road crossing.  It was undisputed, however, that Conrail imposed a lower speed limit of 45 miles per hour for trains traveling through the Morris Road crossing.  Moreover, the evidence presented at trial showed that the Conrail train at issue was proceeding at 40 miles per hour when it reached the crossing.  Thus, we agree with defendant that the higher 60-mile-per-hour federal speed limit had neither a factual connection to the instant case, nor was it relevant.  Plaintiff claims that the trial court's ruling was inconsistent with the holding in 
Baker
, cited above
, where the trial court allowed the speed limit of freight trains  into evidence.  

We distinguish 
Baker
 because each case must be decided independently by the jury, "whose task it is to determine, from the circumstances in existence 
at the particular crossing at the particular time the vehicle approaches
, whether the crossing is extrahazardous and the amount of protection required."  (Emphasis added.)  
Brennan
, 227 Ill. App. 3d at 1080.  Additionally, in 
Baker
, the speed limit for freight trains at the crossing at issue was 60 miles per hour and the speed limit for passenger trains was 78 miles per hour.  The evidence in 
Baker
 revealed that the passenger train which collided with the plaintiffs' automobile was traveling between 60 and 78 miles per hour at the time of the accident. 

Plaintiff somewhat mischaracterizes 
Baker
 by claiming that the court in that case allowed evidence of the train's speed limit even though the train in 
Baker
 was traveling under the legal speed limit of 78 miles per hour.  As we noted above, the evidence presented in 
Baker
 showed that the train was traveling somewhere between 60 and 78 miles per hour.  The speed limits therefore were relevant because the evidence indicated that the train's speed was between the limits of 60 and 78 miles per hour.  
In this case, however, the federal speed limit of 60 miles per hour was not relevant given the undisputed evidence that the train was proceeding at 40 miles per hour.  Under these facts, the federal speed limit of 60 miles per hour does not relate to any of the circumstances surrounding the crossing in the instant case.  We therefore conclude that the trial court did not abuse its discretion by excluding evidence of the federal speed limit.

Next, plaintiff claims that the trial court improperly barred evidence of the diminished reflectivity of the railroad crossing warning sign which was located 390 feet north of the Morris Road intersection.  Specifically, plaintiff claims that the trial court erred by prohibiting the testimony of Randy Baxter and Steve Dorsett, Dwight police officers, who would have testified that the advance warning sign was no longer "shiny" in terms of its reflectivity.  

The record indicates that plaintiff's counsel asked Officer Baxter if he could describe the "shininess" of the advance warning sign.  Defense counsel objected on the basis that the question called for an opinion by the witness.  The trial court found that  in the event Baxter's opinion was not disclosed, defense counsel's objection would be sustained.  Supreme Court Rule 213(g) requires that any person who will offer opinion testimony must, upon written interrogatory, disclose the subject matter on which the opinion witness is expected to testify.  177 Ill. 2d R. 213(g)
; 
Warrender v. Millsop
, 304 Ill. App. 3d 260, 265, 710 N.E.2d 512 (1999)
.  A side bar was then held where defense counsel said, "the degree of reflectorization of the sign is a matter of scientific measurement."  Defense counsel further argued that the witness' opinion was not competent because he was not an expert in optics, metallurgy, or any field which would determine how shiny a sign is.  The position of plaintiff's counsel was that Baxter's testimony was not an opinion, but was merely an observation.  After hearing from both parties, the trial court sustained the objection by defense counsel.  Although the trial court did not allow this particular testimony, it did allow a photograph of the sign into evidence which was taken on the night of the accident.

We are not persuaded by plaintiff's argument that 
Merchants
 permits all testimony concerning the reflectivity of crossing signs.  Here, the trial court initially indicated that the testimony was an opinion and if it had not been properly disclosed, it would not be allowed.  Plaintiff's counsel responded to the defense objection by stating that what was being offered was not an opinion.  Like the trial court, we do not agree.  We conclude that the kind of testimony plaintiff was attempting to elicit through Officer Baxter was not simply an observation.

We also find that, contrary to plaintiff's claim, 
Merchants
 suggests that this kind of testimony is properly provided by an expert.  One of the issues involved in 
Merchants
 was whether
 the trial court properly exercised its discretion in admitting certain expert testimony, specifically, the interaction of lighting conditions and retroflection.  The appellate court found that these areas of inquiry, "are of sufficient difficulty of comprehension and explanation to justify the assistance of expert testimony."  
Merchants
, 121 Ill. App. 2d at 462.  In the instant case, the trial court found that Baxter's opinion concerning reflectivity of the sign was not properly disclosed under Supreme Court Rule 213(g).  Moreover, as we later discuss, plaintiff called a lighting expert  who testified about the sign's reflectivity.  Thus, we conclude that the trial court did not abuse its discretion by  prohibiting the testimony of the police officers in regard to the sign's reflectivity.

Plaintiff's counsel also claims that the trial court's ruling on this point was especially harmful because it prohibited evidence as to the "reflectivity" of the sign at the time of the accident.  According to plaintiff, "[t]his [was] significant because plaintiff's lighting expert who was permitted to testify as to the sign's reflectivity, did not observe the sign until several years after the accident."  The record, however, reveals otherwise.

The evidence at trial showed that plaintiff's lighting expert, Henry Lowell Lazara, defined reflectivity as, "light striking an object causing a brightness that you view ***.  That brightness is the reflectivity of [the] surface."  Over defense counsel's objection, Lazara was permitted to testify regarding the reflectivity of the advance warning sign at issue, which he inspected in 1996.  Lazara said:

"I observed the sign to be apparently quite old.  I ran a test on it, the simple standard test of shining a spotlight at a sign to determine whether it had been treated with a reflective material, a typical Scotch-lite.  If it had, there would be a shining back of the brightness on my spotlight.  I saw no evidence of reflectivity to the surface of that sign."

Lazara further stated that he did not examine the particular sign on November 25, 1992.  However, he was permitted to give an opinion concerning the sign's reflectivity as depicted in the photograph taken at the time of the accident.  After viewing the photograph, Lazara said, "I do not see particular evidence of reflectivity on it."  

Based on the above, the record reveals that the trial court permitted plaintiff's lighting expert to testify as to the sign's reflectivity in 1996 and in 1992.  We are therefore not persuaded by plaintiff's argument that prohibiting Officer Baxter's testimony was prejudicial.  

Further, while visibility is certainly a factor in determining whether a crossing is extrahazardous, each case is to be decided independently by the jury.  
Brennan
, 227 Ill. App. 3d 1080.  Finally, we observe that the picture of the sign admitted into evidence allowed the jurors to assess the reflectivity of the sign on their own.
  We therefore conclude that the trial court did not abuse its discretion by prohibiting the testimony of the Dwight police offers on this issue.

Plaintiff next asserts that the trial court improperly barred  the testimony of Daniel Allen, the former village administrator of Dwight, concerning "switching activities" at the R.R. Donnelly printing plant, which was located near the Morris Road crossing.  We note that plaintiff's reference to switching activities concerns the diversion of railroad cars and engines from one track to another.  Plaintiff claims that in 
Merchants
 and 
Brennan
, evidence of the activity of neighboring business was considered relevant to whether a crossing was extrahazardous.  

Specifically
, plaintiff argues that the court in 
Merchants
 allowed evidence of switching activities on a spur track at a nearby factory.  However, in 
Merchants
, plaintiff presented testimony that there were distracting conditions affecting visibility as well as the physical sight distances.  Specifically, plaintiff presented testimony: 

"There was a cut switch train of 8 cars to the south of the crossing; and that on the siding some 1,000-1,680 *** feet north of the crossing, in the same direction as defendant's Train No. 6 was approaching, there was a working switch train with headlights, gyrolight, whistle and 8 cars, which a part of the conflicting testimony indicated would have been visible to the *** vehicle; and that on a siding for the Fleischmann factory, which building was located about 384 feet east of the crossing, there were 3 parked boxcars." 
Merchants
, 121 Ill. App. 2d at 450-51.  

Because such evidence was admissible in 
Merchants
,  plaintiff argues that the trial court erred by prohibiting it in this case.  Here, the record reveals that the trial court prohibited the testimony based on relevancy.  

Unlike 
Merchants
, there was no evidence in this record which demonstrated that the switching activities at the R.R. Donnelly plant were circumstances present at the instant crossing.  Thus, the switching activity was not a distraction to the driver, "at the particular crossing, at the particular time of the approach of the vehicle," as was apparent in 
Merchants
.  
Merchants
, 121 Ill. App. 2d at 456.  We therefore conclude that the trial court did not abuse its discretion in prohibiting the testimony.  

Plaintiff further interprets 
Brennan
 and 
Morris
 to mean that a determination of whether a crossing is extrahazardous depends upon overall conditions generally affecting a crossing, not just those at the time of the accident.  We are not prepared to extend the holdings in those cases to allow any evidence concerning the  conditions which affect a particular crossing at any time.  Such a decision would not only limit a trial court's ability to exclude evidence based on relevancy but would frustrate the clear mandate of 
Brennan
, which requires that each case involving special circumstances, "at the particular time the vehicle approaches," be independently decided by the jury.  
Brennan
, 227 Ill. App. 3d at 1080. 

Plaintiff also contends that the trial court abused its discretion by limiting her use of demonstrative evidence in the form of a computer animation which illustrated how the streetlights and house lights in Dwight camouflaged the headlights on the train's locomotive.  The record reveals that the trial court allowed some of the animation to be shown, but barred plaintiff from showing the collision between the train and Rub's vehicle because of a risk of misinterpretation by the jury.  The trial court also restricted the use of those animation clips which showed an angle of vison to "frozen (or stopped)" computer drawings.  According to plaintiff, the trial court's ruling unduly restricted plaintiff's ability to illustrate the points made by its expert witnesses.

We do not find that the trial court abused its discretion in excluding parts of this evidence because the record shows the trial judge questioned the accuracy of the animation.  In this regard, the trial judge stated:

"Fundamentally what [the computer animator] said is that there are no measurements to determine the location and the lights, that there is no quantification of the degree of illumination, it was all based on subjectivity on the reports of the experts after they reviewed the animation and the expert's suggesting through their subjective recollection that the animation now looks the way it should." 

Based on the record, it is clear that the trial court did not trust the accuracy of certain parts of the animation.  We are not prepared to disturb that finding.  We therefore conclude that the trial court's decision to exclude certain portions of the animation from admission into evidence was not an abuse of discretion.

Next, plaintiff claims that the trial court abused its discretion by excluding photographs of corn plants which purportedly obstructed the view of the Morris Road crossing during summer and early fall.  The record demonstrates that the trial court excluded the evidence based on relevancy because the accident occurred on November 25, 1992.  Plaintiff contends that crops growing in the vicinity of the intersection for several months each year was relevant to the issue  of whether the Morris Road crossing was extrahazardous, and she further asserts that the evaluation of whether a crossing is extrahazardous is not limited to time when the accident occurred.

Initially, we find that plaintiff's contention concerning the exclusion of photographs of corn plants
 is waived under Supreme Court Rule 341(e)(7).  177 Ill. 2d R. 341(e)(7).  In her brief, plaintiff failed to provide any citation to the record where the trial court excluded this evidence.  Under Supreme Court Rule 341(e)(7), "an appellant's brief must contain his contentions and the reasons therefor, accompanied by citation of authorities and pages of the record."  
Elder v. Bryant
, 324 Ill. App. 3d 526, 533, 755 N.E.2d 515 (2001).  A failure to provide proper argument and authority results in a forfeiture of the argument.  
Elder
, 324 Ill. App. 3d at 533.  

Waiver aside, we do not agree with plaintiff that 
Brennan
, 
Merchants
, and 
Baker
 allow the admissibility of evidence concerning the extrahazardous nature of a crossing to extend beyond the circumstances in existence at the particular crossing at the particular time of the accident.  In 
Merchants
, and later in 
Brennan
, the court set forth the relevant factors to be considered, but limited the circumstances to those in existence at the particular crossing at the particular time the vehicle approaches. 
Merchants
, 121 Ill. App. 2d at 456; 
Brennan
, 227 Ill. App. 3d at 1080
.  In this case, the trial court excluded the evidence as irrelevant because there were no crops growing at the time of the accident.  We cannot say that the trial court abused its discretion by excluding this evidence.

Plaintiff also claims that she should have been able to show that the Morris Road crossing was the only crossing in Dwight with cross bucks, and that all of the other crossings in Dwight, including the crossings immediately to the east and west of the Morris Road intersection, were protected by flashing lights.  The record indicates that the trial court excluded this evidence based on relevancy.  Plaintiff claims that the characteristics of the surrounding neighborhood are a factor which can be considered in regard to whether the crossing is extrahazardous.  
Brennan
, 227 Ill. App. 3d at 1080.  We agree that the surrounding neighborhood is a factor to be considered, but the factors, as pointed out above, are to be considered "
at the particular crossing
 at the particular time to vehicle approaches."  (Emphasis added).  
Brennan
, 227 Ill. App. 3d at 1080.  Thus, the trial court did not abuse its discretion by excluding evidence concerning other crossings in Dwight.
 

Further, plaintiff claims that the trial court's ruling in regard to this evidence was especially prejudicial considering the fact that during 
voir
 
dire
 defense counsel stated that "there [are] a lot" of cross bucks
.  Plaintiff suggests the comment left the jury with the impression that the majority of the intersections in Dwight were protected only by cross bucks, when the exact opposite was true.

We observe that the defense counsel's comment was made
 during the selection of the third panel of prospective jurors.  Because the first and second panel of jurors had been selected and excused, the comment was made outside the presence of many of the selected jurors.  Further, the record reveals that the jurors were informed several times by the trial court that comments made by the attorneys were not evidence.

Despite the remark made by defense counsel during 
voir
 
dire
, we conclude that the trial court did not abuse its discretion by excluding the evidence of other crossings.  Here, the trial judge determined that the presence of flashers at other crossings in Dwight was not relevant to the characteristics of the crossing where the accident occurred.  As we have stated repeatedly above, the admissibility of evidence  is limited to the "particular crossing at the particular time the vehicle approaches."  
Brennan
, 227 Ill. App. 3d at 1080.
  Thus, we find that the trial court did not abuse its discretion in excluding this evidence.

Finally, plaintiff argues that the trial court erred by prohibiting its expert, John Edward Baerwald, from testifying about studies conducted by the Federal Highway Administration and Federal Railway Administration which had shown that flashers are approximately 77% more effective than cross bucks in regard to accident prevention.  According to plaintiff, such testimony was appropriate because it was an elaboration of Baerwald's testimony which was elicited during Conrail's cross-examination.  

Specifically on cross-examination, counsel for Conrail asked Baerwald whether, in his opinion, flashers would have lowered the probability of the accident in this case.  On redirect, plaintiff sought to expand on this point by asking Baerwald about the results of federal studies which indicated the comparative effectiveness of flashers versus cross bucks in terms of protection.  After a side bar, the trial court prohibited plaintiff from eliciting the result of the federal statistics from Baerwald on the basis that this information was not previously revealed.  

Conrail states that the trial court was correct in excluding  the federal statistical studies as inadmissible because it was neither mentioned in the expert's deposition nor mentioned in plaintiff's disclosure under Supreme Court Rule 213(g) (177 Ill. 2d R. 213 (g)).  We agree.

Under Supreme Court Rule 213(g)(i), a party must state by written interrogatory the subject matter on which the opinion witness is expected to testify.  177 Ill. 2d R. 213(g)(i).  As correctly noted by defendants, "Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties."  
Seef v. Ingalls Memorial Hospital
, 311 Ill. App. 3d 7, 21, 724 N.E.2d 115 (1999).

In the instant case, we note that plaintiff's Rule 213 disclosure contained in the record does not even mention Baerwald, let alone federal statistics upon which he intended to testify.  The purpose of Rule 213 is to disclose the subject matter upon which all opinions are based in order to avoid surprising the opposing party.  
Seef
, 311 Ill. App. 3d at 22.  Such was the effect of the  federal statistics raised by plaintiff during her redirect of Baerwald.

We further disagree with plaintiff's interpretation of 
Seef
 as it applies to the instant case.  Plaintiff claims that 
Seef
 stands for the proposition that "testimony which merely elaborates on a disclosed opinion does not violate Rule 213."  In fact, 
Seef
  actually states, "[a]lthough elaborating on a disclosed opinion does not automatically violate Rule 213."  
Seef
, 311 Ill. App. 3d at 23.
  Here, plaintiff sought to bolster Baerwald's testimony with a federal study that had not been disclosed.  In our view, the act of raising undisclosed statistics on re-direct was not merely elaborating on a previously disclosed opinion.  Instead, we conclude that the conduct frustrated the purpose of Supreme Court Rule 213(g) because it surprised Conrail with testimony that had not been previously disclosed.  177 Ill. 2d R. 213(g)(i).

Further, plaintiff also claims that 
Seef
 provides "a party who elicits testimony from an expert on cross-examination cannot object to such testimony on grounds that it violates Rule 213 disclosure requirements."  While the court in 
Seef
 actually stated, "[p]laintiff's objection *** was to testimony elicited by plaintiffs' counsel during cross-examination ***.  Plaintiffs cannot now object to this testimony they elicited," we find the facts in the instant case are distinguishable.  
Seef
, 311 Ill. App. 3d at 23.

Here, on cross-examination, counsel for Conrail elicited  Baerwald's opinion that 
flashers would have lowered the probability of the accident in this case.  On redirect, plaintiff sought to expand on the point by asking Baerwald about the results of federal statistics.  Thus, plaintiff's attempt to elaborate was not based merely on Baerwald's testimony, the opinion that flashers would have lowered the probability of an accident.  Instead, plaintiff sought to expand on the testimony by using federal statistics that had not been disclosed.  As a result, we conclude that the trial court did not abuse its discretion by excluding the evidence. 
 
  

We next consider whether the trial court erred by giving the jury certain limiting instructions that plaintiff claims were prejudicial.  Specifically, plaintiff complains that three limiting instructions given by the trial court "unduly emphasized Rub's contributory negligence." 

In the first limiting instruction complained of, the court stated:

"The indication that I'm going to give to the jury is a preliminary indication, and that is that the lighting on the front of the locomotive here is being brought to the attention of the jury as to the allegations -- as to the extent, if any, that the jury weighs that information concerning the allegations of the defense that this collision was caused by the negligent conduct of the automobile driver himself.

There is no indication that there was any violation of any requirement with regard to the lights that were situated on the front of the locomotive, so, therefore, this evidence is not being admitted for the purpose of suggesting any negligence on the part of the defendant railroad with regard to the lights they had on the front.  It is admitted with regard to the conduct of the other party.

What other party?  The other party being the person who was driving the motor vehicle, for whatever weight you wish to give, the visibility or conspicuity of the railroad train and as to that issue, which is an issue concerning the allegations by the defendant railroad that the incident was caused by the negligent conduct of the driver of the car himself.  As to that issue, the conspicuity or visibility of the railroad train is relevant."

In the second limiting instruction, the trial court stated:

"There are two vehicles involved.  One is a train, and one is an automobile here.  There is no allegation by the plaintiff or suggestion or evidence that the lights on the train were in violation of anything.  Also, no allegation that there was negligence on the part of the railroad defendant with regard to the lights, none.  So this is not being admitted for the purpose of suggesting any negligence on the part of the railroad with regard to the lights.

* * *

Well, what is it being admitted for?  It is being admitted solely for the limited purpose of the visibility of the train as it would come towards the intersection and it is being utilized for the purpose of the allegations of the defendant that the negligent conduct of the automobile driver was the cause of this collision, which, of course, raises the question of what the automobile driver could see or visibility or conspicuity of the train.  For that purpose and that purpose only, we're talking about lights on the intersection?  No. Lights on the train."

Concerning the final limiting instruction, the  court said
:

"Any reference to the visibility of the train, its color, paint, the lighting on it, is in no way being brought into this case to suggest to you that the lighting or conspicuity or visibility or the painting was in any way, shape or form in violation of any rule or regulation or in fact constituted any deviation from ordinary care or was neglect.

* * *

It is being put into evidence for a very limited purpose and a limited purpose only.  One of the limited purposes is already indicated to you previously is the weight, if any, that you decide to give those elements, what elements?  Elements of how visible the train was when you go back there and consider the allegations of the railroad that the claimant driver, decedent was comparatively negligent when he drove onto the railroad tracks.

Visibility of the train when you consider alleged negligence of the driver of the train as to what he could see with regard to the train." 

The record reveals that plaintiff did not object to any of these limiting instructions at trial.  As we noted above,"[f]ailure to raise an objection at trial or during post-trial proceedings results in waiver of the right to raise the issue on appeal."  
Limanowski
, 275 Ill. App. 3d at 118.
  Because plaintiff failed to object to these limiting instructions at trial, the issue is waived on appeal.

Waiver aside, we agree with Conrail that plaintiff's claim fails on the merits.  Over an objection by defense counsel, the trial court allowed plaintiff to ask questions in regard to lighting on the train, but only admitted the evidence for the limited purpose of establishing Rub's contributory negligence.  As Conrail correctly points out, "[i]t is fundamental to our adversarial process that a party cannot claim error when it induced the trial judge's mistake."  
J.L. Simmons Co., Inc. ex. Rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.
, 108 Ill. 2d 106, 116, 483 N.E.2d 273 (1985).  Thus, we conclude that the trial court did not err by providing the jury with the limiting instructions set forth above, and we reject plaintiff's argument on the fourth issue. 

We turn to the final issue whether the cumulative effect of the errors alleged by plaintiff above denied her the right to a fair trial.  
Here, we agree with Conrail that plaintiff has failed to demonstrate reversible error concerning any one of her claims thus far.  She cannot prevail by attempting to group the alleged errors together.  If none of the alleged errors were prejudicial to plaintiff, neither is their cumulative effect.  
McShane v. Chicago Investment Co.
, 235 Ill. App. 3d 860, 878-79, 601 N.E.2d 1238 (1992).  We therefore  reject defendant's claim on this issue.

In addition to the errors alleged in the first four questions on appeal, plaintiff contends that the trial court erred by  allowing Conrail to ask plaintiff's traffic engineer a number of improper questions.  Specifically, plaintiff suggests that it was improper for Conrail to ask the expert whether he had reason to believe that Rub had not seen the advance warning sign or knew of any evidence that Rub had not seen the train.

Plaintiff also claims that the trial court erroneously permitted Conrail to ask its own expert if the train crew had maintained a proper lookout, while the court refused to allow plaintiff's expert to testify that the train crew was negligent in operating the train.  According to plaintiff, such disparate treatment amounted to reversible error according to plaintiff. 

With regard to these two errors, plaintiff neither explains why these decisions by the trial court were improper, nor does she provide any authority in support thereof.  "Allegations of trial court error summarily raised without supporting authority are deficient and warrant a finding of waiver."  
Elder v. Bryant
, 324 Ill. App. 3d 526, 533, 755 N.E.2d 515 (2001).  "Contentions supported by some argument but absolutely no authority do not meet the requirements of Supreme Court Rule 341(e)(7)."  
Avery v. State Farm Mutual Auto Insurance Co.
, 321 Ill. App. 3d 269, 277, 746 N.E.2d 1242 (2001); 155 Ill. 2d R. 341(e)(7).  " ' A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research.' "  
Bryant
, 324 Ill. App. 3d at 533, quoting 
People v. Hood
, 210 Ill. App. 3d 743 746, 569 N.E.2d 228 (1991).  Therefore, plaintiff's argument in regard to these alleged errors is waived. 

[The preceding material is non-publishable under Supreme Court Rule 23.]

The judgment of the trial court is affirmed.

Affirmed.

GORDON and COUSINS, JJ., concur.